Bertha HECHT, Plaintiff,

v.

HARRIS, UPHAM & CO., a partnership, Harris, Upham & Co., Inc., a corporation, Arthur R. Mejia, Asa V. Wilder, George Upham Harris, Henry Upham Harris, Jr., Frank L. Patty, et al., Defendants.

Civ. No. 44137.

United States District Court
N. D. California.

March 28, 1968.

Lowenthal & Lowenthal by Reed Bement, Morris Lowenthal, San Francisco, Cal., Donald F. X. Finn, New York City, for plaintiff.

E. C. Mahoney, Burlingame, Cal., for defendant Asa V. Wilder.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson, Thomas Hartwell, San Francisco, Cal., Emanuel Becker, New York City, for remaining defendants.

## MEMORANDUM OF DECISION CONTAINING THE FINDINGS AND CONCLUSIONS OF THE COURT (Rule 52 F.R.Civ.P.)*

SWEIGERT, District Judge.

Plaintiff, a customer of Harris, Upham Co., a brokerage firm dealing in securities and commodities, has brought this action against that firm and Asa V. Wilder, its Registered Representative and Commodities Manager, to recover damages for alleged violations of Section 17(a) of the Securities Act of 1933, (15 U.S.C. § 77q(a)); Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b); and, Securities Exchange Commission Rule 10b–5 (17 C.F.R. 240.10b–5); the Commodity Exchange Act of 1936 (7 U.S.C. § 1 et seq.); Art. III, Sec. 2 of the Rules of the National Association of Securities Dealers; and the common law of the State of California.

This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1337; Section 22(a) of the Securities Act of 1933 (15 U.S.C. § 77v(a)) and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa).

Securities Act Section 17(a) (15 U.S.C. § 77q(a)), makes it unlawful for any person in the offer or sale of any securities by the use of interstate commerce directly or indirectly to (1) employ any device, scheme or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state

* As Modified by Order filed March 22, 1968.

a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Securities Exchange Act Section 10(b) (15 U.S.C. § 78j(b)) makes it unlawful for any person, directly or indirectly, by the use of interstate commerce or of the mails or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors.

Pursuant to this Act the Securities Exchange Commission promulgated Rule 10b-5 (17 C.F.R. 240.10b-5), providing that it shall be unlawful for any person, directly or indirectly, by the use of interstate commerce, or of the mails or any facility of any national securities exchange, (a) to employ any device, scheme or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, not misleading, or (c) to engage in any act, practice or course of business which operates as or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

■ That a private civil action for damages lies for violation of the Securities Acts has become well established. Fratt v. Robinson, 203 F.2d 627, 37 A.L.R.2d 636 (9th Cir. 1953); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Matheson v. Armbrust, 284 F.2d 670 (9th Cir. 1960); Errion v. Connell, 236 F.2d 447 (9th Cir. 1956).

THE BASIC FACTS

The basic facts in this case are that plaintiff, now 77 years of age and a widow, was born and reared in England,

attended grammar school and high school attended a teachers' college for 2 years and taught school there. She went to Canada at the age of 23 and worked there as a private tutor, then moved to New York where she supervised manual training for youngsters, moved to Salt Lake City and worked there as a salesgirl, and at the age of 32 moved to San Francisco to work as a saleslady in a department store.

In 1923 she became a housekeeper in the San Francisco home of the Koshlands, caring for the household and for the Koshland children over a period of 14 years. She then visited Europe for 6 months, returned to California and resumed employment as a tutor of children at the Crystal Springs School for Girls.

In 1939 her principal recommended her for the position of housekeeper and tutor in the home of Herbert Hecht of San Mateo County, whose wife had just died leaving with him a teenage daughter.

Hecht was a businessman engaged in the import and export business and he also maintained both a securities and a commodities account with Merrill Lynch, dealing with that firm through defendant Wilder and others. When Wilder left Merrill Lynch in 1953 to join another firm, Hooker & Fay, Hecht allowed him to handle an additional but relatively small soy bean commodity account at Hooker & Fay.

Plaintiff remained in the Hecht home in the capacity of housekeeper and tutor for 14 years. In 1953, she married Hecht and remained in the home for another 2 years as his wife—until he died suddenly of a heart attack in 1955, leaving a substantial estate which was eventually divided equally between plaintiff and Hecht's daughter.

Although her salary, during her years in the Koshland and Hecht homes up to the time of her 1953 marriage to Hecht, was never more than about $125 a month, plaintiff had been able to allocate a considerable part of it to a stock brokerage account. There is evidence that she had some dealings in stocks as early as 1928.

In any event, she maintained a small margin account, involving about 5 to 10 transactions a month with Johnson Company from 1931 to 1936. In 1936 her account was transferred to Walston Company and maintained with that firm until 1955.

Plaintiff's dealings with these brokerage firms were carried on through Ernest Fairey, a brokerage representative. After her entry into the Hecht household in 1939 Herbert Hecht also assisted her in the handling of the Walston account.

During the last 16 years of her account at Walston Company (1939–1955), there were 32 security sales and 41 security purchases during that period—not more than 5 sales in any one year and generally less or no sales at all.

Starting with about $2,000, her personal account had increased in value during the years 1931–1955, to about $15,000, by 1939 and to about $65,000 in 1955. It was then reduced to $42,000 by reason of some withdrawals for the convenience of her husband shortly before his death.

In July 1955, shortly after her husband's death, the account (net value $42,000) was transferred from Walston Company to Hooker & Fay where defendant Wilder was employed. Wilder's acquaintance with plaintiff came about as a result of his previous business acquaintance with her husband and he and his wife befriended plaintiff at his home after her husband's death. Thus, the relationship between Wilder and the plaintiff was a social as well as a business relationship.

In June, 1956, after her husband's death, plaintiff, who up to that time had never maintained a commodities account, wrote a letter (Defendants' Exhibit RRR) to Wilder enclosing a check for $7,500 for "starting me on the soy beans when you think it is the right time." Plaintiff claims that she wrote this letter upon some inducement of Wilder, a commodities specialist, to deal in commodities through him.

Several months later (August, 1956) her account at Hooker & Fay was substantially augmented by stocks distributed to her from her husband's estate, stocks having a market value at that time of about $486,620, bringing the account to a net value of $508,532 (market value of securities $526,659; debit balance re securities [$26,928]; balance re commodities $8,792).

There is evidence that Wilder suggested to her that a portion of her newly acquired assets be placed in a trust or custody account with a bank, but that plaintiff refused to consider such arrangement.

Plaintiff dealt through Wilder with Hooker & Fay for about 21 months—until May, 1957, when the account was transferred to Harris, Upham Co., upon Wilder's leaving Hooker & Fay to become a Registered Representative and San Francisco Commodities Manager for Harris, Upham Company.

As of May, 1957, the date of transfer of the account to Harris, Upham Co., the account had a net value of about $533,161 (market value of securities $552,000; debit balance re securities [$46,252]; balance re commodities $27,413).

From May, 1957, plaintiff continued to deal through Wilder with Harris, Upham Co., for six years and ten months —until March, 1964, when she removed the account from the hands of Wilder and Harris, Upham upon being advised by her income tax accountants that the net value and the income potential of her account had greatly deteriorated.

By March, 1964, the account at Harris, Upham had dropped from its original net value of about $533,161 to about $251,308 (market value of securities $427,134; debit balance re securities [$187,464], cash balance re commodities $11,638).

This suit was commenced against Wilder and Harris, Upham Co., on September 20, 1965.

It can be calculated that, if the original portfolio transferred to Harris, Upham in May, 1957, had been maintained

intact during the period 1957–1964 (a period of general rise in securities values) it would have had a net value by March, 1964, of about $1,026,775 instead of $251,308.

It can also be calculated that, if the original portfolio of the securities delivered to Harris, Upham Co., in May, 1957, had been maintained intact the account would have yielded by March, 1964, dividends and bond interest in the amount of about $194,135 instead of $124,237.

Actually, the account was not maintained intact but, on the contrary, was very actively traded, both in securities and commodities. During the 6 year and 10 month period over 10,000 transactions occurred with a gross dollar volume of about $100,000,000. About 1200–1400 of these transactions (with a dollar volume of 9 and one-half million) involved transactions in 200 different corporate stocks. About 9,000 transactions (with a gross dollar volume of about 90 million) involved transactions in various commodities.

In the course of these transactions plaintiff's account showed an overall profit during the period on the securities side of about $164,773. On the commodity side it showed profits of about $515,000 but losses of about $690,000—an overall loss on commodities during the period of about $176,000. Thus, plaintiff's account showed an overall net loss of about $12,000 in the combined securities and commodities accounts.

However, in the course of the handling of the account at Harris, Upham during the 6 year, 10 month period, plaintiff was charged by the firm and paid to it commissions and mark-ups on security transactions of about $91,000, and commissions on commodity transactions of about $98,000—a total of about $189,000 in commissions and mark-ups.

Plaintiff also paid through Harris, Upham, interest on funds borrowed by the firm and advanced by it to her margin account (to which interest charge Harris, Upham added ½%) in the total amount of $43,000.

It thus appears that the handling of the account at Harris, Upham involved commissions and interest in the total amount of $232,000—an average of about $33,000 a year—during the period of the account.

During the period of the account, dividends from stocks and interest from bonds were received into the account in the amount of $124,237, and it was the practice of plaintiff to draw down this income as received—an average income from this source of about $18,000 a year for her living expenses and personal use.

During the period of the account, plaintiff made additional deposits to the capital of the account in the amount of about $47,000 and made withdrawals from the capital of the account in the amount of about $135,000—a net withdrawal from capital (over deposits to capital) of about $88,000.

From this net capital withdrawal, however, plaintiff necessarily paid out a total of about $64,000 in federal and state income tax on capital gains (over losses) arising from stock and commodity purchases and sales transactions effected by Wilder's active trading of her account.

It appears, therefore, that over and above the dividends and bond interest received by plaintiff ($124,237, i. e. $18,000 a year) not more than about $24,000 of withdrawn capital was actually available for plaintiff's personal use during the entire 6 year, 10 month period of the account. In other words, the overall amount available for her personal use was about $21,400 a year.

In terms of the effect of the active trading in the account during its 6 year and 10 month period at Harris, Upham Co., upon the income potential of the account, there is evidence that as of March, 1964, the date her account was taken away from Wilder and Harris, Upham, the stocks then in the portfolio would produce a gross income of only about $11,140 a year. (Testimony of financial advisor Wentworth, Tr. p. 1900–1901).

This gross income, however, according to Wentworth, would be about 90% offset by the interest plaintiff would have to pay on the accumulated debit balance in her account as of March, 1964. Thus, according to Wentworth, plaintiff's realizable net income from stocks or bonds in the portfolio as of March, 1964, was reduced to about $1,000 a year. (Tr. pp. 1900–1901).

However this calculation may be varied, it is clear that the state of the account was such that in addition to the drastic reduction in the net value of her account, the income potential of the account had become vastly impaired to the point where plaintiff would be required to draw mainly on capital in order to maintain her accustomed manner of living.

All during the course of the account, plaintiff regularly received from Harris, Upham the customary confirmation slips showing each security or commodity transaction as made and requesting immediate notice of any error. She also received from Harris, Upham the customary monthly statements of her account.

It was the practice of Wilder to be in contact with plaintiff by telephone concerning her account almost every morning of the business week, and also to visit her at her home at least weekly and sometimes several times a week. Also, plaintiff would often telephone Wilder at his office during the day.

It was the practice of plaintiff to put her confirmation slips on a table in her home, "separating the buys from the sells", in order to discuss them with Wilder. After the discussions Wilder would gather up the confirmation slips and statements and take them to his home—although he had duplicates for his own use at the office.

During the period of the account plaintiff had her own income tax accountants with whom she consulted concerning her personal tax deductions. Wilder supplied schedules to these income tax accountants, which indicated plaintiff's capital gains and losses arising out of her securities transactions. Plaintiff was also represented on occasion by attorneys—including representation by able and reputable counsel, recommended by Wilder in connection with the distribution of her husband's estate.

## PLAINTIFF'S CONTENTIONS

Plaintiff contends that, lacking the education, business experience, understanding, skill, mental competence and physical health necessary to enable her to properly handle her accumulated and inherited assets and needing professional guidance for that purpose, she came under the influence and control of defendant Wilder shortly after her husband's death in early 1955 when she was ill, mentally distraught and in the throes of a nervous breakdown; that he took advantage of her condition by inducing her to sign papers authorizing the transfer of her securities account, then at Walston Company, to his control as a Registered Representative of Hooker & Fay and, shortly thereafter, similarly arranged for the transfer to that account of the securities distributed to her from her husband's estate; that in 1957 he similarly took advantage of her by inducing her to sign papers transferring the account to Harris, Upham Co.; that he induced her to place complete confidence in him; that he represented that he would handle her account with competence and care in her best interests and substantially as it had been handled for her under her husband's guidance at Walston Company, preserving certain securities which plaintiff had instructed him not to sell, preserving the blue chip stocks and also preserving the investment nature, character and value of her account with a view to preservation of capital and receipt of regular dividends in accordance with her instructions to him that her main concern was to be able to live from her dividend income.

Plaintiff contends that defendant Wilder abused the confidence reposed in him by handling the account in a manner contrary to plaintiff's instructions and

"unsuitable" for her particular needs and objectives: (1) by selling certain securities which plaintiff had instructed him not to sell, (2) by failing to preserve the investment nature, character and value of her account in accordance with her instructions, (3) by purchasing speculative and low grade securities and by selling dividend paying securities, (4) by effecting the purchase and sale of securities and commodities without her knowledge or comprehension as to their significance or suitability, (5) by selling securities short and commodities for tax maneuvering purposes, (6) by purchasing and selling securities and commodities in amounts that were excessive in view of the character of the accounts and her needs and objectives, purchasing and selling identical securities and commodity futures repeatedly and within short periods, and switching from one investment to another of equal or inferior quality without any justification other than to profit himself and his firm by earning commissions, (7) by inducing her to make a deposit to put her into the highly speculative and risky commodities market in June, 1956, and, thereafter, without her comprehension, transferring large amounts from her securities account to a commodities account to carry on commodity speculation, (8) by preparing and showing to plaintiff summaries of her account containing false and misleading statements designed to make the account appear in better condition than it was in fact, (9) by failing to disclose the interest of certain members of his firm in securities purchased for plaintiff's account, and (10) by converting to his own use about $60,000 in connection with the so-called Itek and Colonial transactions.

Concerning the liability of defendant Harris, Upham, plaintiff contends that it induced and participated in the alleged fraud: (1) by failing, as a controlling person, within the meaning of Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)), and as such, responsible for the acts of Wilder, its Registered Representative and Commodities Manager, to maintain and enforce a proper system of internal supervision and control over the handling of plaintiff's account, (2) by failing to learn the essential facts about plaintiff's investment needs and objectives, (3) by permitting plaintiff to be made its customer without her knowledge or consent, (4) by marking up its prices on riskless over-the-counter transactions, and (5) by generally abusing the confidence reposed by the customer in the firm.

Plaintiff contends that the conduct of defendants constitutes a violation of the Securities Act of 1933, § 17(a), (15 U.S.C. § 77q(a)); the Securities Exchange Act of 1934, § 10(b) (15 U.S.C. § 78j(b)), and Rule 10b–5 of the Securities Exchange Commission (17 C.F.R. 240.10b–5); and the Commodity Exchange Act of 1936 (7 U.S.C. § 1 et seq.).

Plaintiff also contends that the conduct of Wilder amounted to a breach of the trust reposed in him by plaintiff over which this Court would in any event have pendent jurisdiction under the rule declared in such cases as Errion v. Connell, 236 F.2d 447 (9th Cir. 1956) and Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961).

Plaintiff contends that she is entitled to recover in excess of $1,109,000, actual damages broken down as follows:

(1) The difference between $1,026,000 (the projected value of her account if the portfolio of securities delivered to Harris, Upham Co., in May, 1957 had remained intact, or virtually so, as an investment account) and $250,000 (the actual value of the account in March, 1964—the claimed date of discovery of fraud) i. e., $776,000.

(2) The difference between $194,135 (the projected amount of dividends and bond interest that would have been received if the portfolio had remained intact) and $124,237 (the actual amount of dividends and bond interest received i. e., $69,898.

(3) All commissions paid, i. e., $174,000 ($76,000 on security transactions, $98,000 on commodities transactions),

plus $15,000 in security transaction mark-ups, and all interest paid ($43,000) on Harris, Upham advances to her margin account, a total of $232,000.

(4) All income taxes, federal ($57,-730) and state ($7,000) paid on account of capital gains (over losses) arising from purchases and sales made for her account, i. e., $64,730.

## DEFENDANTS' CONTENTIONS

Defendants contend, in effect, that plaintiff had acquired a familiarity with security trading long before her dealings with either defendant Wilder or defendant Harris, Upham, through her dealings in securities since as early as 1928; especially through her accounts maintained with Johnson Company in the early thirties and with Walston Company between 1936 and 1955; also through her regular, frequent discussions with Ernest Fairey, her broker for about 23 years (1931–1955); also through her presence in the Hecht household where Hecht's dealings, not only in securities but in commodity futures as well, were a topic of conversation, and, also through her regular reading of the financial pages of the newspapers.

Defendants' theory is that plaintiff was an experienced, informed and smart trader, "a veteran gambler", well aware of the risks involved in trading, not only in securities but also in commodity futures, concerning which she had been told by her husband and others that commodities were for "high rollers" and that one could "lose your shirt" in the commodities market; that she had a mind of her own and was not given to trusting others and was not lacking in comprehension of financial and market matters; that her considerable success in security trading through the years had instilled in her the desire and the habit for trading in the market; that all the extensive trading and speculation in her account was upon her insistence and with her full comprehension and approval; that there was, therefore, no breach of confidence by Wilder, nor any fraud within the meaning of the Securities Acts; that plaintiff is estopped by her conduct and barred by laches from asserting any such breach or violation; and, further, that plaintiff's cause of action is barred by the statute of limitations; and also that any breaches or violations by Wilder were such that defendant, Harris, Upham, could not be held responsible.

## WAIVER—ESTOPPEL—LACHES

The first question presented in this case is whether, assuming breaches of trust or violations of the Securities Acts by defendant Wilder and assuming responsibility of defendant Harris, Upham therefor, plaintiff has by her conduct so waived all or some of the claimed violations as to be estopped or barred by laches from asserting them.

 It has been held that, since the purpose of the Securities Exchange Act is to protect the innocent investor, as distinguished from one who loses his innocence and waits to see how his investment turns out before he decides to invoke the act, estoppel and waiver are defenses to a civil action under the act and also that, since there is no applicable federal statute of limitations, the doctrine of laches is also a defense. Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962).

It has also been held that investors who repeatedly accept confirmations and statements disclosing the essentials of transactions with salesmen of a brokerage partnership, thereby indicate an election not to rely on any breach of duty imposed by the act and that such investors, failing seasonably to make complaints concerning reasonably discoverable facts, are barred by waiver, estoppel and laches from later assertion of wrongdoing. See: Carr v. Warner, 137 F.Supp. 611 (D.Mass.1955); Nash v. J. Arthur Warner & Co., 137 F.Supp. 615 (D.Mass.1955); Goldenberg v. Bache & Co., 270 F.2d 675 (5th Cir. 1959); Merrill Lynch v. Bocock, 247 F.Supp. 373 (S.D.Tex.1965); James Wood v. Coe, 297 F.2d 651 at 657 (2d Cir. 1961).

We have already outlined the information that was available to plaintiff during the course of her dealings with Wilder and Harris, Upham. Yet, plaintiff never (until March, 1964) complained or raised any question either to Wilder, to Hooker & Fay or to Harris, Upham, indicating that some or any of the transactions shown by the confirmations and monthly statements were contrary to her understanding or her instructions to Wilder concerning the manner in which the account was to be handled.

A question of fact is involved concerning the extent to which plaintiff was able to comprehend what was going on. This case is a classic example of the trial process wherein able counsel for the respective parties have polarized the issues by their extreme and undiscriminating contentions concerning plaintiff's alleged competence or her alleged ignorance with respect to brokerage accounts and the securities and commodities markets.

Actually, plaintiff was neither as "dumb" in matters of brokerage accounts as plaintiff's counsel contends or as plaintiff, herself, made herself appear to be on the stand, nor was she as smart, experienced, or informed as defendants' counsel would make her out to be.

The truth concerning this issue lies in between and it is the function of the Court to try to find it from the evidence. For the reasons hereinafter set forth, this case cannot be and will not be resolved on a simplistic formula under which either side can "take all."

█ Without making distinctions at this point concerning the degree of plaintiff's knowledge of brokerage accounts, we hold and find that her knowledge and experience, together with the information at hand, were at least sufficient to indicate and put her on actual notice that her account was being handled in a manner contrary to her claimed understanding and instructions.

The confirmation slips and monthly statements, considered in the light of plaintiff's previous knowledge of and experience with brokerage accounts, were sufficient at least to enable plaintiff to see and understand (1) that her account, however, the transfer may have been induced by Wilder, had been in fact transferred from Walston Company to Hooker & Fay and thence to Harris, Upham; (2) that the securities from her husband's estate, however the deposit may have been induced by Wilder, had been in fact deposited into the brokerage account; (3) that the particular securities, which she now claims were not to be sold, were in fact being sold and repurchased from time to time, and that securities, which she now claims to have been blue chip, dividend-paying securities— and as such to be retained—were in fact being sold and repurchased from time to time; (4) that, whatever may have been her understanding or her instructions to Wilder concerning the manner in which the account was to be handled, it was in fact being handled by Wilder at Hooker & Fay and at Harris, Upham in a manner quite different from the manner of its handling at Walston Company; (5) that, instead of being maintained intact or substantially so, as a relatively inactive investment type account, as at Walston, it was being very actively traded, not only in the familiar blue chip investment type stocks, but also in a wide variety of stocks being bought and sold from time to time; (6) that, however Wilder may have originally gained her consent to enter the commodities markets, she was in fact actively trading in commodities; and (7) that commissions and interest were being charged to her account in connection with the stock and commodity transactions effected by Wilder.

█ Having, with this knowledge and understanding, permitted Wilder and his firm to continue handling the account on this basis in reliance upon her apparent acquiescence for nearly seven years, the Court finds that plaintiff's conduct is such that she is barred by estoppel, laches and waiver (within the meaning of the second appeal in Royal Air Properties v. Smith, 333 F.2d 568 (1964)) from suddenly taking the position that such trading of the account in securities and com-

modities was unsuitable for her needs and objectives, contrary to her instructions and should never have occurred.

■ We hold, therefore, that plaintiff must be held to have assumed the ordinary risks of profit or loss in what she knew to be a trading account in securities and a speculative account in commodities. For this reason the Court considers her contentions (3), (4) and (5) above noted (i. e., that Wilder purchased speculative and low grade securities in place of dividend-paying securities, effected the purchase and sale of commodities without her knowledge or comprehension as to their significance or suitability, and sold securities short for tax maneuvering purposes) to be unfounded *except* insofar as such transactions were a part of "excessive" trading of her account by Wilder—a subject to be presently discussed.

■ To allow a recovery measured by the difference between the actual net value and income of the account in March, 1964, and what there would have been if the account had been maintained virtually intact, i. e., $835,000, as claimed by plaintiff in items (1) and (2) of her prayer above referred to, would for these reasons be an oversimplification of this case and wholly unwarranted by the evidence.

It is, therefore, unnecessary in our view of the facts of this case to determine whether a broker, even considered as a fiduciary holding himself out as skilled in matters of the market (the so-called "shingle theory"), can be held liable under the Security Acts for what has been described as "unsuitability" of the account for the needs and objectives of the customer—as plaintiff contends in this case.

Plaintiff contends that the securities and commodities recommended and bought and sold for plaintiff's account were "unsuitable" within the meaning of Art. III, Sec. 2, of the Rules of the National Association of Securities Dealers.

■ On this point we merely note that the Security Acts, as applicable to this case, are essentially directed at *fraud* —not against mere negligence or errors of judgment on the part of the broker. Although an agent must exercise the degree of care or skill impliedly represented by the terms of his undertaking, even a fiduciary does not guarantee the principal against incidental loss, nor does he undertake that he will make no errors or mistakes. (See, 3 C.J.S. Agency §§ 155–156, pp. 34–36). Nor do mere irregularities or carelessness render him liable for fraudulent breach of trust. (See, 3 C.J.S. Agency § 138, pp. 6–7, citing in note 96, Jewett v. Bowman, 29 N.J.Eq. 174).

By a 1938 amendment, the Securities Exchange Act was amended to add Sec. 15A (15 U.S.C. § 78o–3) for the formation of national securities associations empowered to promulgate rules and to discipline members, subject to review by the Securities and Exchange Commission. The National Association of Securities Dealers (N.A.S.D.), of which Harris, Upham is a member, registered under this amendment.

Pursuant to this registration, the N.A.S.D. has promulgated certain rules requiring "Fair Dealing with Customers" —the heart of which is that, "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." (Art. III, Sec. 1), and more specifically, that "no member shall effect any transactions, or induce the purchase or sale of, any security by means of any manipulative, deceptive, or other fraudulent device or contrivance" (Art. III, Sec. 18, patterned after the language of the Act itself); also "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable ground for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs." (Art. III, Sec. 2).

The Constitution of the New York Stock Exchange provides disciplinary

measures against members found guilty "of conduct or proceedings inconsistent with just and equitable principles of trade." (Art. XIV, § 6).

It has been held that, although there may be implied civil liability on the part of a broker under the Securities Exchange Act for violations of certain kinds of exchange or dealer association rules, (e. g., rules which merely amount to a substitute for regulation by the S.E.C. itself), no implied civil liability may be predicated on rules which give power to discipline members for certain kinds of misconduct, including merely unethical behavior, which Congress could well not have intended to give rise to a legal claim, e. g., conduct which, although unethical under the association or exchange rules, does not amount to a fraud within the meaning of the fraud provisions of the Act itself. Colonial Realty v. Bache & Co., 358 F.2d 178 (2d Cir. 1966).

In that case, the Court held that the "just and equitable" rules of the N. Y. Stock Exchange (Const. Art. XIV, above quoted) did not give rise to a private civil damage action by a customer against the broker, saying that the Court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging implication of federal civil liability carrying a considerably heavier burden of persuasion than where the liability is based upon the statute or the S. E. C. regulations enacted pursuant thereto.

As to the N.A.S.D. "suitability" rule (Art. III, Sec. 2, above quoted), upon which plaintiff relies in part in this case, the question arises whether it is the kind of rule upon which a civil action for damages by the customer can be based. Conceivably, a broker might honestly think that his "ground" for believing his recommendation "suitable" is "reasonable", only to find himself overruled in a law suit and found guilty of fraud notwithstanding his good faith. As pointed out by Friendly, J., in *Colonial*, supra, p. 182, the practical consequences of allowing private federal damage suits based on rules of this kind, and involving judicial review of market judgments, would be considerable.

In any event, we have found on the evidence in this case that plaintiff is barred by estoppel and waiver from proceeding merely upon the theory that her account, as handled by defendants, was "unsuitable" to her needs and objectives.

This finding, however, does not necessarily exclude the possibility of certain violations by defendants in the course of handling plaintiff's account, i. e., violations which would be so beyond the limits of plaintiff's competence, knowledge and understanding of securities and commodity markets that she should not be found to be barred by estoppel or laches from asserting them.

EXCESSIVE TRADING—CHURNING

We here take up plaintiff's contention (noted as [6] above) that Wilder sold and purchased securities and commodities in amounts that were excessive in view of the character of plaintiff's account and her needs and objectives, purchasing and selling identical securities and commodity futures repeatedly and within short periods and switching from one investment to another of equal or inferior quality without any justification other than to profit himself and his firm by earning commissions—a contention which is in substance and effect a charge of what is commonly known in the brokerage business as "churning".

There is no specific mention of churning in the Securities Exchange Act, but, pursuant to Sec. 15 of the Act (15 U.S.C. § 78o), dealing only with over-the-counter transactions, the Securities Exchange Commission promulgated a rule (S.E.C. Rule 15(c)–1–7 [17 C.F.R. § 240.15c 1–7]) defining the term "manipulative, deceptive or other fraudulent device or contrivance" as used in Sec. 15(c) (1) of the Act, as including " . . . any act of any broker or dealer designed to effect with or for any customer's account, in respect to which such broker or dealer or his agent or employee is vested with any discretionary power, any

transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of the account."

The pending action, however, is brought, not under Sec. 15 of the Act or this last mentioned rule, but primarily under Sec. 10(b) of the Act (15 U.S.C. § 78j(b)), and on S.E.C. Rule 10b–5 (17 C.F.R. 240.10b—5) promulgated thereunder.

We intend, however, to later consider Sec. 15 of the Act and Rule 15(c)–1–7 in connection with the applicable statute of limitations.

To date, most cases involving charges of churning have been dealt with by the Securities and Exchange Commission through its enforcement of the anti-fraud provisions of the Securities Acts, e. g., Securities Act, Section 17(a) (15 U.S.C. § 77q(a)); Securities Exchange Act, Section 10(b) (15 U.S.C. § 78j(b)) (both above quoted and relied upon in this case) and also Securities Exchange Act, Section 15(c) (15 U.S.C. § 78o(c)) to be later discussed herein.

In each instance where the Commission's finding of churning, within the meaning of principles developed and applied by the Commission, has been appealed, the finding has been upheld, (e. g., Irish v. SEC, 367 F.2d 637 (9th Cir. 1966) and Hersh v. SEC, 325 F.2d 147 (9th Cir. 1963).

The Courts have also held in private damage suits that excessive trading, churning, disproportionate to the size and character of the account and primarily for the purpose of creating commissions rather than on behalf of the customer, constitutes a fraud within the meaning of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), and S.E.C. Rule 10b–5, and Section 17(a) of the Securities Act (15 U.S.C. § 77q (a)). Lorenz v. Watson, 258 F.Supp. 724, 731–732 (E.D.Pa.1966); Newkirk v. Hayden, Stone & Co., CCH Fed.Sec.L. Rep. para. 91,621 (S.D.Cal.1965). See also on the general subject of churning: Churning by Securities Dealers, 80 Harv.

L.Rev. 869 (1967). Securities Law, Bromberg, Sec. 2.4(4) p. 40, note 99.

Although trading accounts, such as plaintiff in this case permitted to continue, will normally show greater activity than accounts in which the dominant purpose is investment, even trading accounts may be considered under the excessive trading principle where, because of the customer's known financial condition, or express wishes or the nature of the account, the registered representative, being in control of and responsible for the character of the trading, should avoid the creation of the risks attending active churning. Newkirk v. Hayden, Stone & Co., supra; see also, In re Norris & Hirshberg, Inc., 21 S.E.C. 865, 890 (1946); First Securities Corp., Securities Exchange Act, Release No. 6497 (1961) p. 3.

In a case involving an admitted trading account it has been held that overtrading for the personal gain of the broker constitutes a violation of Securities Act, Section 17(a) (15 U.S.C. § 77q(a)) and also of SEC Rule 15c–1–7 (17 C.F.R. 240.15c–1–7). Newkirk v. Hayden, Stone & Co., supra.

An examination of the decisions of the Securities Exchange Commission, an administrative agency with experience and expertise in this more or less specialized field of law, indicates that the following principles concerning churning have become well established.

Where a customer so relies upon the recommendations of the broker that the broker is in a position to control the volume and frequency of transactions and the broker, abusing the confidence reposed in him, recommends and induces an excessive number of transactions, involving multiple trading in the same security and switches from one security to another, on which commissions and profits are taken without regard to the needs and objectives of the customer, then there is a device, scheme or artifice to defraud within the meaning of The Securities Act, Section 17(a) (15 U.S.C. § 77q(a)) and The Securities Exchange

Act, Sections 10(b) (15 U.S.C. § 78j(b)) and 15(c) (1), and Rules 10b–5 (17 C.F.R. 140.10b–5) and 15c–1–2 (17 C.F.R. § 140.15c–1–2). Norris & Hirshberg, Inc. 21 SEC 865 (1946); E. H. Rollins & Sons, Inc., 18 SEC 347 (1945); R. H. Johnson & Company, 36 SEC 467 (1955); Behel, Johnsen & Co., 26 SEC 163 (1947).

▮ Although control by the representative over the account is essential to a finding of churning, such control need not amount to a formal vesting of discretion in the representative. A degree of control sufficient to warrant protection may be inferred from evidence that the customer invariably relied on the dealer's recommendations, especially when the customer is relatively naive and unsophisticated. See, e. g., Looper and Company, 38 SEC 291, 296 (1958); First Securities Company, 40 SEC 589, 590 (1961).

Apart from the question whether rules of the NASD in and of themselves give rise to a civil action for damages, they may in any event be considered as expressions of the industry itself concerning what constitutes proper conduct, the violation of which under certain circumstances may amount to fraud. NASD Rule (Art. III, Sec. 15(a)) prohibits: "Transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such accounts."

▮ For the foregoing reasons the Court concludes that "churning" as that term has been discussed herein (essentially involving a bad faith, fraudulent purpose of the broker to derive profit for himself by disregarding the interests of his customer), is a manipulative device or contrivance within the meaning of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), and is a device to defraud and a practice and course of business which operates as or would operate as a fraud and deception within the meaning of S.E.C. Rule 10b–5 (17 C.F.R. 240.10b–5). Lorenz v. Watson, 258 F. Supp. 724 (E.D.Pa.1966).

After hearing the testimony of doctors, psychiatrists and others who observed and dealt with plaintiff, this Court is satisfied that, although her experience and competence were such that she knew her account was being actively traded by Wilder in both securities and commodities, contrary to her claimed instructions and her claimed needs and objectives, her comprehension of market operations and business affairs beyond that was so meagre that she still had to rely upon Wilder concerning whether trading in any particular volume or with any particular frequency was reasonably suitable or, on the contrary, whether it was excessive under the circumstances.

▮ Without going into the detail of the evidence concerning plaintiff's knowledge, experience, physical condition, mental capacity and temperament, this Court, basing its finding not only on all the relevant evidence but upon its observation of the plaintiff as a witness on the stand, finds that, whatever her previous experience had been, plaintiff's comprehension of the securities market was definitely limited, her comprehension of the commodities market was virtually nil and her comprehension of both was most superficial.

Much of the evidence relied on by defendants to support their theory of a smart, informed, experienced and resourceful customer, (e. g., plaintiff's occasional evasions and exaggerations, and her occasional bragging to others about her market knowledge and success) tends really to establish her as an unstable, erratic and commercially unsophisticated woman trying to appear smarter than she really was. Whatever market knowledge she had was mainly jargon picked up from those who handled her account—Fairey, her husband, and later, Wilder—and from financial columnists. Whatever gain she made in her own small account up to 1955 was due to its handling by Fairey and her husband, rather than to any astuteness or knowledge on her part.

This Court finds that, regardless of her previous accounts at Johnson Company and at Walston Company, plaintiff was not in fact as informed, experienced or smart as defendants would make her out to be, and further, that this fact would have been obvious to Wilder and to any one in authority at Harris, Upham who might have taken the trouble to inquire.

Although plaintiff had enough experience to tell from the confirmation slips and monthly statements that she was paying commissions and interest on transactions in her account, she just did not have the sufficient competence to understand whether the frequency and volume of the transactions might be "excessive".

As observed in Newkirk v. Hayden, Stone & Co., supra, confirmation slips and monthly statements of this kind do not enable a customer to determine his overall position or the total amount of real profit or loss occurring in his account—unless the customer is sufficiently skilled to elaborate upon them to make such determination.

The evidence shows that plaintiff was unable to keep adequate accounts, a fact well known to Wilder, and that her ability to elaborate upon these confirmations and monthly statements was further limited in this case by Wilder's practice of gathering them up from her during his visits to her home in order to keep them himself.

The usefulness of these confirmations and statements was further limited by Wilder's practice of preparing for plaintiff annually from 1956 to March 29, 1963, summaries of the condition of her account. These summaries were, not only beyond the limits of plaintiff's financial acumen, but also were prepared in such manner as to allay any fear that the volume and frequency of the trading was excessive—even for an account of this kind which she unwisely permitted to continue. All of these summaries were prepared in such fashion as to continually suggest "Total appreciation", "Gain", "Total Gain", "Increased Value of Account", "Increased Value", etc.

The last such summary, prepared as of March 29, 1963—only one year before the account was removed from Harris, Upham—summarizes the situation as follows: "In the last five years from 1958 through 1962, inclusive, nearly a quarter of a million dollars or about two thirds of the original value has been withdrawn and the account still has a value greater than the original amount." (Plts.Ex. 20-F-1).

Without going into the figures set forth to support this conclusion, we are convinced that such conclusion was misleading and that discussion of such a summary with plaintiff (as Wilder testified that it was discussed) would have given the impression that no excessive trading was going on.

We are of the opinion that, when the extent, volume and frequency of the trading to which plaintiff was apparently assenting, or to which at least she was not objecting, began to impair the net value of her capital and its potential for real income, it became Wilder's duty to frankly and fairly explain these basic considerations to her.

The fact that Wilder, at the beginning of his relationship with plaintiff, suggested that she put a substantial part of her estate in a trust or custody account implies recognition on his part of the needs and objectives of a retired widow, dependent in the main upon preservation of her capital as a source of income for her livelihood. That she unwisely refused this suggestion and thereafter estopped herself from objecting to the handling of her account for active security and commodity trading did not give him carte blanche to use his control over the account for trading in a volume and with a frequency incompatible with her situation.

This Court, therefore, finds that in this respect and to this extent, plaintiff was a naive customer dependent upon Wilder and on Harris, Upham.

■ Our finding concerning the limits of plaintiffs' competence is such that, although she may be estopped by her conduct from now complaining that her securities account was "unsuitably" transformed by Wilder from an investment type account into a trading type account and although she may be estopped from now complaining that commodity trading was introduced into the account without her knowledge or consent, it does not follow that she is estopped from complaining that her account, even considered as a securities and commodities trading account was, nevertheless, churned by excessive transactions in both.

So far as Wilder's control over the account is concerned, there can be no doubt that (except in two or three instances where plaintiff had read or heard something about some company, e. g., Ampex and Creamery Package) the volume and frequency of the security trading was left to Wilder. Plaintiff did not insist upon trading in any particular volume or with any particular frequency. On the contrary, Wilder made the recommendations in these matters and she invariably followed them.

As far as commodity transactions are concerned, this Court, considering the evidence as a whole, finds that the plaintiff's letter of June, 1956, concerning "starting me on soy beans when you think it is the right time" was in fact written upon the encouragement and recommendation of Wilder, the commodities specialist, and that, whatever she may have been told by others about the risks of the commodities market, plaintiff relied on Wilder as to whether this remarkable entry of a relatively unsophisticated widow into the badlands of the commodity market, followed by nearly seven years of intensive and continuous commodity trading, was excessive when considered in light of the nature of her account, her situation and her needs and objectives.

In this sense and to this extent Wilder was in full control of the account and, however plaintiff may now describe her confidence or lack of confidence in Wilder, all these matters were left by her in his hands and through him in the hands of Harris, Upham for nearly seven years.

The question remains whether under these circumstances plaintiff's account was in fact so excessively traded by Wilder as to constitute in effect a fraud upon her within the meaning of the Security Acts and the Securities Exchange Commission Rule 10b–5.

■ Churning cannot be and need not be, established by any one precise rule or formula. The essential question of fact for determination is whether the volume and frequency of transactions, considered in the light of the nature of the account and the situation, needs and objectives of the customer, have been so "excessive" as to indicate a purpose of the broker to derive profit for himself while disregarding the interests of the customer. E. g., Looper and Company, 38 SEC 291 (1958).

■■ The mere fact that in the course of an account profits are made from time to time—or even the fact that an overall net profit is made—does not necessarily justify the churning of the account. Whether churning has occurred must be determined by the handling of the account as a whole. E. H. Rollins & Sons, 18 S.E.C. 381 n. 50; Behel, Johnson & Co., 26 S.E.C. 163 (1947).

■ One consideration for determining churning is to compute the number of times the money invested in the account is "turned over"—in effect the turn-over rate, the ratio of total cost of the purchases made for the account during a given period of time to the amount invested. E. g., Behel, Johnson & Co., supra, 167; R. H. Johnson & Co., 36 S.E.C. 467 (1955).

Another consideration in determining churning is to inquire whether there has been a pattern of in-and-out trading, i. e., a sale of all or part of the customer's portfolio with the proceeds immediately reinvested in other securities followed in a short period by the sale of the newly acquired securities. The period of time

that securities are held in the account before being sold is a relevant factor in this inquiry. See, e. g., Behel, Johnson & Co., supra at 166–67; R. H. Johnson & Co., supra, at 471–80.

A further consideration is to compare the dealer's profits with the size of the customer's investment. See, e. g., E. H. Rollins & Sons, Inc., supra, at 381.

 The evidence in the pending case is such that the Court is satisfied that, judged by the foregoing considerations, plaintiff's account, even considered as a trading security and commodity account, was grossly and unfairly churned by Wilder for no reason other than to generate profits for the firm and indirectly for himself.

The evidence is to the effect that of a total of 644 security transactions, 296 or 45% were held for less than 6 months; 434, or 67% were held less than 9 months; and 529, or 82%, were held less than a year.

The securities account, according to plaintiff's theory of computing turnover rate, was turned over 11.5 times during the 6 year, 10 month period. According to defendants' theory, the turnover rate was 8.04 times.

The commodities account, assuming an average investment of about $35,000, and a gross volume of purchases and sales of 89 million, was turned over about 2,500 times during the period.

On an account of about $500,000, plaintiff paid commissions and markups of $189,000 on security and commodity transactions, and interest of $43,000—a total of $232,000, or about 40% of the size of the account without considering plaintiff's capital gain taxes which further affected the possibilities for net gain.

Commissions earned by Harris, Upham Co., on plaintiff's account on security transactions—$76,000—were more than any other of the firm's 8,000—9,000 security accounts in the San Francisco Office—except 11–14 other accounts—and amounted to 39% of all security commissions generated by Wilder.

Commissions earned by Harris, Upham from plaintiff's account on commodity transactions—$98,333—were more than any other commodity account at its San Francisco Office, 31%—38% of all commodity commissions at that office and 59% of all commodity commissions generated by Wilder.

Although plaintiff's account represented less than 1/10 of 1% of the accounts in the San Francisco Office, the commissions ($174,000) and the interest ($43,000) charged plaintiff represented at least 4.7% of the total income of the San Francisco Office—about 50 times the average charged a customer during the period.

In the course of 1200—1400 security transactions and 4457 closed commodity transactions Wilder generated 51% of the total commissions earned by him for Harris, Upham.

It was the practice of Wilder to wire the New York home office of Harris, Upham to determine the available buying power in plaintiff's margin account for the apparent purpose of trading the account to the limit. (Tr. p. 1577; See Exhibit 29).

Although Wilder testified in his deposition that he was on a straight salary and that he had received no bonuses or salary increases during the period of the account, it was established during the trial that Harris, Upham gave him two bonuses—one of $5,000 in June, 1961 and another of $5,000 in January, 1962, and, further, that he did in fact receive an increase of salary in March, 1961, from $1250 to $1500 a month which remained his salary until March, 1963, when it was restored to $1250 a month and, further, that in June, 1964, three months after the loss of the Hecht account, his salary was sharply reduced to $850 a month. It thus appears that to this extent Wilder was being indirectly compensated by Harris, Upham in proportion to the volume of transactions and the amount of commissions generated by him for the firm.

The witness Wentworth, an Investment Advisor, testifying as an expert, expressed the opinion that the trading reflected in the account was incompatible with plaintiff's circumstances and that the commission payments were disproportionate to the size of the account.

Defendants contend that commodities are not "Securities" within the meaning of the Securities Act and the Securities Exchange Act, that commodities are separately regulated by the Commodities Exchange Act of 1936 (7 U.S.C. § 1 et seq.) and that no recovery can be had herein for claimed churning of the commodities account.

■ It has been held that a private action for damages lies for violation of the Commodity Exchange Act. Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D. Ill.1967).

It has also been held that in actions based upon the Securities Acts, where a single violation encompasses two kinds of property—one securities and the other non-securities—the Court may award damages for the entire violation. This principle has been applied in cases where commodity transactions and security transactions were part of the single scheme. Sinva v. Merrill Lynch, 253 F.Supp. 359 (S.D.N.Y.1966); Goodman v. H. Hentz & Co., 265 F.Supp. 440, 445 (N.D.Ill.1967). See also, Errion v. Connell, 236 F.2d 447 (9th Cir. 1956).

In the present case the excessive trading of plaintiff's account by Wilder in both securities *and* commodities did constitute a single scheme. Although only $7500 was originally deposited in plaintiff's commodity account, Wilder was able to effect an enormous amount of commodity trading by transferring a total of $245,360 from her security account to the commodities account. Thus, the security and commodity transactions were inextricably co-mingled.

Defendants contend that churning of a commodities account is not prohibited by the Commodities Exchange Act and that, therefore, there can be no such thing as churned commodities.

Whatever may be the inherent differences between a security transaction on the one hand, and a commodity futures transaction on the other, there is no reason to say that churning, which has to do, not with single transactions, but with the volume and frequency of a series of transactions, can occur in a security account but not in a commodity account. The test in either case is whether under the circumstances the trading in the account has been "excessive."

■ In any event, we hold that, where a registered representative, handling a securities account induces a customer to open a commodities account to provide an additional opportunity for generating commissions, the commodity account may be regarded as a mere device for churning the securities account and any commissions derived from excessive commodity trading may be regarded as in effect a churning of the securities account.

■ The evidence in the pending case compels the inference, and the Court finds, that the only reason for Wilder's encouragement of plaintiff to enter into and to remain in the commodities market, trading in commodities intensively for nearly 7 years, was to provide an additional market in which to generate commissions. Wilder's knowledge of plaintiff's situation, needs and objectives was such that, regardless of plaintiff's acquiescence, any other reason for such trading in highly speculative commodities for a retired widow (without any knowledge of, or any protectible stake in commodities) must be ruled out as an absurdity.

Although plaintiff may now be estopped from asserting that she should not have been in the commodities market at all and from recovering for commodities losses on that theory, the estoppel should not go so far as to prevent her from complaining that this commodities account, like her securities account, was grossly churned by Wilder as a device for generating commissions.

## LIABILITY OF HARRIS, UPHAM RE—CHURNING

The question arises concerning the liability of Harris, Upham for what we have found to be excessive trading of the account by Wilder, its registered representative for security accounts and its San Francisco manager for commodities accounts.

Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)) provides that every person who directly or indirectly "controls" any person violating the act, or the rules and regulations thereunder, shall also be liable jointly and severally with and to the same extent as the controlled person *unless* the controlling person acted in good faith and did not directly or indirectly induce the act constituting the violation.

It has been held that absent a showing by the controlling person that it acted in good faith, the controlling person is liable and, further, that to satisfy the requirement of good faith it is necessary to show that precautionary measures were taken to prevent the violation and, further, that failure of the controlling person to maintain and diligently enforce a proper system of internal supervision and control constitutes participation in the misconduct and the violation will be deemed to have been committed, not only by the controlled person, but also by the controlling person who did not perform the duty to prevent it. Lorenz v. Watson, supra at 732–733, (applying this controlling person provision in a case where the violation consisted of alleged excessive trading of the customer's account); Newkirk v. Hayden, Stone & Co., supra, (holding that liability must be imposed upon the controlling firm when the firm knows of the excessive trading and permits it to continue).

The general principle of internal supervision and control in the brokerage business is reflected in numerous publications of the American Association of Stock Exchange Firms and the National Association of Securities Dealers, in both of which organizations Harris, Upham held membership.

These publications indicate that good standard practice in the brokerage business requires that a "partner" is obliged to know the "essential facts" relative to each customer and to "supervise diligently" all accounts handled by registered representatives to obtain the appropriate facts concerning each customer prior to opening the account; that each time a new account is opened new information should be obtained directly from the customer; that the investigation performed by the registered representative should be a continuing one; that note of any changes in the customer's financial status should be kept; that the registered representative should ascertain whether the customer understands the basic mechanics of purchasing securities; that representatives must know and keep themselves informed of circumstances relating to their clients' interests which may have a bearing on the clients' interests as investors, and that a firm should not rely exclusively on a registered representative to obtain the essential facts but should have a series of checks to determine that the full facts are being obtained sufficiently to satisfy the firm's responsibilities.

It might be noted that a Harris, Upham & Co., supervisory memorandum required a partner to approve commodity transactions for a woman's account before it was effected (Plaintiff's Exhibit 13) and that its Commodity Manual made commodity accounts for women unacceptable unless approved by a partner who has determined that the woman has "sufficient experience and knowledge of commodity trading."

The evidence in the pending case is to the effect that upon the employment of Wilder by Harris, Upham in May, 1957, and upon his opening of the Hecht account at that firm, two new account cards—one for a securities margin account and one for a commodities account—were prepared by Wilder for plaintiff as a new customer of Harris, Upham. These cards indicated that the new cus-

tomer was not a minor, that she was a retired person and, significantly, that dividends were to be sent to her monthly. The word "widow" was also written on the new account card, either by Wilder or by the Harris, Upham cashier. Later, in 1958, two new accounts were opened— a cash account and a "short" account— and in 1959 a "tax maneuver" account.

There was no provision on the new account cards for indicating the age of the new customer (she was then about 66 years of age) or her financial circumstances or the existence and nature of any previous security or commodity accounts of the new customer or her investment needs or objectives or any other information—except only whether the account was to be a "cash", "margin", or "commodity" account.

Mejia, the resident San Francisco partner, who was required under Harris, Upham's own rules to "approve" the opening of accounts, testified in effect that he approved the accounts merely upon being orally informed by Wilder (at that time a new employee of the firm) that plaintiff had been known to him and had been a client of his. Beyond this, according to the evidence, defendant Mejia, who had never met or heard of plaintiff, made no further inquiry of any kind but relied entirely upon Wilder and presumably upon the data on the account card.

Although the data on the new account card, meagre as it was, was sufficient to put the firm on notice that the new customer, a retired "widow" expecting to receive her dividend checks monthly, was about to deal, not only in securities on margin, but also in what is admittedly the highly speculative and risky specialty of commodity futures trading, no further inquiry was made or any steps taken in the matter upon the opening of the accounts.

In fact, according to the evidence, no further inquiry of any significance was made by Mejia, or by any one in authority at either the San Francisco or New York offices of Harris, Upham, during the entire period of the account.

On the contrary, the evidence is that as late as 1965, the date of filing this suit, Mejia stated that he knew very little about the Hecht account—notwithstanding the fact that the firm's daily records clearly indicated that her account was among the most actively traded and most lucrative (in terms of commissions and interest earned by the firm) in the San Francisco office.

The clear inference from the evidence is that Harris, Upham was well aware of the commissions and interest being earned by Wilder for the firm by what we have found to be the excessive trading of plaintiff's account, and that the bonuses and salary raises paid to Wilder were largely, if not entirely, related to this extremely profitable account.

As observed in Lorenz v. Watson, supra, at p. 733,

" * * * Doubtless, considerable injury to the investing public is not only possible but inevitable when a salesman is compensated in direct proportion to the volume of transactions he handles, and his activities go unsupervised. The most effective means for insuring adequate supervision is to impose liability for injury resulting from its absence."

The Court finds and concludes from the evidence that defendant Harris, Upham did not maintain a reasonably adequate system of internal supervision and control; that it did not enforce with any reasonable diligence such system as it did maintain and that in this respect defendant Harris, Upham cannot be said to have acted in good faith within the meaning of Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)) but did, on the contrary, indirectly induce, participate in, approve and accept the benefits of what we have found to be the excessive trading of the account by Wilder.

MEASURE OF DAMAGE

Having found that plaintiff's account was churned in violation of Section 10

(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10b–5), the question remains concerning the proper and fair measure of plaintiff's recovery.

Certainly, churning an account may conceivably cause damage to a customer over and beyond the commissions and interest generated by excessive transactions—and undoubtedly did so in this case.

In this case we have found that plaintiff assumed the ordinary risks of an active trading account in securities and commodities (as distinguished from maintaining the account virtually intact as a mere investment account) and that plaintiff's competence was sufficient to bar her from complaining on that score *except* insofar as the trading was "excessive". Our finding of fact is such that plaintiff in this case cannot recover upon the theory of "loss of bargain" (i. e., what she would have *if* the account had been handled as a mere investment account) and, that her recovery must be limited to such damage as was caused by the churning of the account.

At least one proximate result of the churning of an account is that the customer must pay the commissions generated and the interest caused by the churning. Theoretically, any recovery of commissions and interest should be limited to such as are attributable to "excessive" transactions as distinguished from those transactions which would not have been excessive under the circumstances. But, the difficulty of making such a distinction is obvious. Just what volume and frequency of trading in plaintiff's accounts would have been within reasonable limits under the circumstances would be extremely difficult to determine with any degree of precision.

██ Where, as in this case the Court finds that, in any event, defendants' handling of the account as a fiduciary has clearly and unfairly transgressed reasonable limits under all the circumstances, any uncertainty involved in making a precise distinction has been created by the conduct of the defendants and it may be justly held that defendants have lost their right to complain of an award to plaintiff of the total commissions and interest payments she was required to pay in the course of the excessive trading. See, *Newkirk,* supra. See also, Gratz v. Claughton, 187 F.2d 46, 51–52 (2d Cir. 1951).

The Court finds and concludes that, in addition to recovery of commissions and interest paid by plaintiff, other elements of damage are proximately traceable to and were caused by the churning of the account.

██ Since the commodity account was "a mere device for churning the securities account", the commodity losses of plaintiff, although not recoverable by plaintiff *as such,* are nevertheless, recoverable insofar as they proximately resulted from this means of churning the securities account. Therefore, the net commodity losses of plaintiff (over and above commodity interest and commissions) i. e., $78,000, as claimed by plaintiff, are recoverable.

██ Further, since the Court has already found that the trading in commodities was accomplished by transfers, totaling $235,360 from the securities account to the commodities account, those funds were thereby made unavailable for the purchase of dividend-paying securities. It is evident that Wilder's excessive trading of the securities account, involving not only transfers to the commodity account but also the selling of dividend-paying securities to acquire speculative, non-dividend paying securities, did substantially impair the income and income potential of the account. Although the amount of loss of dividend and interest income attributable to the churning of the account is difficult to calculate, the Court, viewing the evidence as a whole, finds that the excessive transactions in this case did further damage plaintiff by causing her to lose dividend income in an amount not less than a further $65,000.

The manner in which dividend income was distributed to plaintiff (i. e., by a gross check of Harris, Upham Co., which did not list the individual dividends included nor indicate any offsetting interest charges on her margin debit) was such that, although plaintiff knew her account was being traded in both securities and commodities, she was not in a position to discover or realize the effect of *excessive* trading upon the potential and actual income from her account.

## STATUTE OF LIMITATIONS

■■■ The Securities Exchange Act contains no federal statute of limitations provision applicable to violations of Section 10(b)–5 and Rule 19(b)–5. In the absence of such provision the statute of limitations of the state wherein the violation occurs applies to a suit for damages under the Act and, when there is a violation of the *manipulative or deceptive device* provision of the Securities Exchange Act, e. g., 15 U.S.C. § 78j(b), the action must be deemed to be based upon fraud. Therefore, the state limitation statute relating to fraud actions applies. See, Fratt v. Robinson, 203 F.2d 627, 634–635 (9th Cir. 1953). See also, Royal Air Properties v. Smith, 312 F.2d 210, 214 (9th Cir. 1962) (recognizing this but adding that the defense of laches is also applicable).

The applicable California statute is, therefore, Cal.C.C.P. Sec. 338(4) providing a three year limitation for actions for relief on the ground of fraud provided, however, that the cause of action is not deemed to accrue until the discovery by the aggrieved party of the facts constituting the fraud.

We have held that Rule 10b–5 does condemn churning and we have also found that so far as "excessive" trading is concerned, i. e., churning, the information on hand to plaintiff at any one time, considered in the light of the limitations upon her competence and the circumstances already reviewed, was not sufficient to put her on notice that

the trading of her account was excessive—until she was so advised by her income tax accountants in March, 1964—the date we find to be the date of discovery so far as "excessive" trading is concerned.

We have considered the fact that Section 29 of the Securities Exchange Act (15 U.S.C. § 78cc) (which declares void any *contract* made in violation of the act) contains a provision, Section 29(b) (15 U.S.C. § 78cc(b)), to the effect that no contract shall be void by reason of that subsection, in any action maintained in reliance upon that section by a person claiming violation of any rule prescribed pursuant to Section 15(c) (1) of the act (15 U.S.C. § 78o(c) (1)—unless such action is brought within *one year* after discovery that the sale or purchase involves such violation *and* within *three years* after such violation.

Section 15 (15 U.S.C. § 78o) of the Securities Exchange Act is a section which by its terms deals only with "over-the-counter" markets and prohibits (in subsection 15(c) (1) thereof) brokers and dealers in the over-the-counter markets from effecting or inducing sales or purchases by means of any "manipulative, deceptive or other fraudulent device or contrivance" as may be defined by the Commission.

Pursuant to that section, the Commission promulgated a rule, SEC Rule 15c–1–7 (17 C.F.R. § 240.15c1–7) which defines "manipulative, deceptive or other fraudulent device or contrivance", as used in Section 15(c) (1) of the act, as including any act of any broker or dealer designed to effect with or for any customer's account, in respect to which such broker or dealer or his agent or employee is vested with any discretionary power, any transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account.

It will be observed, therefore, that the limitations contained in Section 29 would

be applicable only (1) to excessive transactions in the "over-the-counter" markets, (2) to transactions in which the broker or his agent is vested with a "discretionary power", and (3) to actions in reliance upon Section 29 (15 U.S.C. § 78cc) to declare contracts void for violation of a rule prescribed by Section 15(c) (1).

The pending action is not brought in reliance upon Section 29 of the Act nor is plaintiff's claim based on Section 15(c) (1) of the act nor Rule 15c1-7 promulgated thereunder. It is brought upon the implied right to bring a private civil action for damages for violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and on SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

Further, the excessive transactions shown by the evidence in this case are overwhelmingly transactions on a national exchange rather than on the over-the-counter market. Such over-the-counter transactions as may be involved cannot be readily ascertained and segregated from the evidence as presented and, to the extent that they could have been, the information necessary to make such segregation was obviously more readily available to defendants than to plaintiff and the burden of proceeding was, in that respect, upon defendants.

Further, neither the plaintiff nor the defendant contends in this case that any discretionary power was ever vested in Wilder or his firm by plaintiff. Plaintiff's contention on this point is, not that Wilder was vested with discretionary power, but only that plaintiff invariably relied upon his recommendations concerning the nature, volume and frequency of transactions and that in that sense he virtually controlled the volume and frequency of trading in the account.

■ We hold therefore, that the statute of limitations applicable to the churning in this case is, not Section 29

(b) of the Securities Exchange Act, but rather Cal.C.C.P. § 338(4). See, Lorenz v. Watson, supra, at 733–734, see also, Fratt v. Robinson, supra, 634–635; Royal Air Properties v. Smith, supra, 214.

## THE COLONIAL TRANSACTION

■ In September, 1959, Wilder purchased 220 shares of Colonial Savings & Loan Association stock—100 shares for himself, paid for by his own check for $12,000, and 120 shares at $125 a share for plaintiff at $15,000 paid for by her check for $15,000.

However, pursuant to Wilder's instructions, the certificate issued to plaintiff was for 100 shares instead of 120 shares. Later a certificate for 2 additional shares was purchased by and issued to plaintiff. In 1961 Colonial announced a 10 to 1 stock split and the original shares were worth about $360 a share by September, 1961. Just prior to the split, Wilder obtained from plaintiff a transfer to himself of her 102 shares and claims that these 102 shares, together with the 20 undelivered shares, were transferred to him as a gift although plaintiff denies any knowledge of any such gift transaction.

From the evidence the Court finds that these 102 shares were procured from plaintiff by Wilder without her understanding and that the transaction also involved the failure to deliver 20 shares to her and was, in effect, a fraud upon her.

Plaintiff is entitled to recover for the 102 shares, later transferred to Wilder, their value at the time of the transfer, i. e., $360 per share, or $36,720. In addition, plaintiff should recover, for the undelivered 20 shares, the same value per share, i. e., $360, or $7,200, since it is reasonable to assume that, under the circumstances, Wilder would have obtained the additional 20 shares from plaintiff had he delivered them to her as he

should have. The total recovery on the Colonial transaction is thus $43,920.

## THE ITEK TRANSACTION

On November 14, 1958, Wilder, acting on a rumor, purchased through the Harris, Upham account for plaintiff, 100 shares of Itek stock at $94 per share for plaintiff's account. This solicitation and purchase was unlawful under California law because it had not been "blue-skyed". (See Cal. Corporate Securities Law §§ 25500, 26100). Shortly after the purchase the order department of Harris, Upham called his attention to this illegality and indicated it should be removed from her portfolio.

Wilder, according to his testimony, called on plaintiff, explained that the stock was speculative and told her that he would redeem it from her, knowing, however, that meanwhile, as of January, 1959, Itek had declared a 400% stock dividend in the form of a 5 to 1 split as a result of which the stock had risen from $94 per share to $300 a share. Wilder brought plaintiff a check for $9400 and obtained a receipt reciting payment in full for 100 old (500 new) shares of Itek Corporation with all accrued rights. He obtained plaintiff's endorsement of the new shares over to himself, placed the shares in his wife's account at Harris, Upham Company and later sold the stock for $25,400—a profit to the Wilders of $16,000.

From the evidence in the case the Court finds that when Wilder consummated the so-called $9400 redemption transaction, he did not make clear to plaintiff that the shares had risen in market value from $94 to about $300 a share and that they were then worth, not $9400 but $30,000, and that the transaction was in effect a fraud upon her.

Plaintiff is entitled to recover the difference between $9400 (the amount received from Wilder for the redeemed stock) and $30,000 (the market value of the shares at the date of Wilder's purchase from plaintiff, i. e., $20,600).

## LIABILITY OF HARRIS, UPHAM RE ITEK AND COLONIAL TRANSACTIONS

A stock brokerage firm can act only through its various partners, employees and agents and the acts of its employees and agents, in the course of their employment are the acts of the firm. In re Sutro Bros. & Co., S.E.C. Release No. 7052 (April 10, 1963).

Although he may not be a member of the firm, a manager is ordinarily regarded as having broad powers and ordinarily has authority to make such contracts with customers as are ordinarily made by brokers in the course of transaction of their brokerage business —even if the contracts are made in violation of his instructions from the firm or the rules of the Stock Exchange. 1 Meyer, Law of Stock Brokers, p. 481 (1931).

The Court finds and concludes from the evidence that, with respect to the Itek and Colonial transactions, Wilder was acting in the course of his employment for Harris, Upham and that his conduct in such transactions must be deemed to be the conduct of Harris, Upham. Further, the Court finds that in these transactions Harris, Upham failed to comply with the requirement for internal supervision as provided by Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)).

## SUMMARY RE ACTUAL DAMAGES

For the foregoing reasons and in the particular respects set forth herein, the Court makes its ultimate finding that defendants, by the use of means and instrumentality of interstate commerce and of the mails and of the facilities of a national securities exchange have employed a device, scheme and artifice to defraud plaintiff and have engaged in a practice and course of conduct which operates as a fraud upon plaintiff in connection with the purchase and sale of securities, and further, that as a natural consequence and proximate result thereof, plaintiff has sustained actual damages

for which judgment should be entered in favor of plaintiffs against defendants Wilder and Harris, Upham Co., as follows:

Actual damages due to churning:

| | | | |
|---|---|---|---|
| Commissions and Interest paid by plaintiff | $232,000 | | |
| Other damages due to churning | 143,000 | | |
| | | 375,000 | |

Actual damages due to the separate Itek and Colonial transactions:

| | | | |
|---|---|---|---|
| Itek | 20,600 | | |
| Colonial | 43,920 | | |
| | | 64,520 | |
| Total actual damages | | | $439,520 |

———◆———

## INTEREST

The Court further finds and concludes that the equities of the situation are such that interest at the rate of seven per cent (7%) should be awarded on the amount of $232,000 (interest and commissions paid by plaintiff) from April 1, 1964 (the date on which said elements of damage became fixed and ascertainable) to the date of judgment herein. See, Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Speed v. Transamerica Corp., 135 F.Supp. 176, 194–201 (D.Del.1955), modified and aff'd, 235 F.2d 369 (3d Cir. 1956); and Ross v. Licht, 263 F.Supp. 395, 411–412 (S.D.N.Y.1967).

## PUNITIVE DAMAGES

Plaintiff seeks a further award of exemplary damages. The court has considered, however, whether as a matter of law exemplary damages can be awarded in this kind of action.

In Mills v. Sarjem Corp., 133 F.Supp. 753, 769–770 (D.N.J.1955), an action based in part, at least on Sec. 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), the Court expressed the dictum that plaintiffs were not entitled to punitive damages in the light of Section 28 (a) of the Securities Exchange Act (15 U.S.C. § 78bb(a)). (See also, Meisel v. North Jersey Trust, 216 F.Supp. 469 (S.D.N.Y.1963)).

Section 28(a) of the Securities Exchange Act provides in part that no person permitted to maintain a suit for damages under the provisions of this chapter, shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

Assuming that the term "actual damages" is used in contradistinction to exemplary damages and not merely in contradistinction to possible double recovery in several different proceedings or actions—the question remains whether the pending action is one in which plaintiff is "permitted to maintain a suit for damages under the provisions of this chapter" within the meaning of Section 78bb.

In Fratt v. Robinson, 203 F.2d 627 (9th Cir. 1953) at p. 632, our circuit recognized that, although there are several sections of the Act specifically "permitting" civil damage causes of action (e. g., 15 U.S.C. §§ 78i(e), 78p(b) and 78r(a)), there is no such permission in the Act for a civil cause of action for damages arising out of violation of Section 10(b) of the Act (15 U.S.C. § 78j(b))—the

section upon which the pending suit is primarily based.

The civil damage right of action, which *Fratt,* supra, nevertheless recognized, is based, not upon any statutory permission, but upon the general rule that a person injured by a statutory violation under such circumstances as here involved, may seek redress in the courts upon the general principal of tort. See, Kardon v. National Gypsum, 69 F.Supp. 512 (E.D. Pa. 1946), cited in *Fratt,* supra, at 632.

Exemplary damages are traditional under appropriate circumstances in tort actions and at least one case, Nagel v. Prescott & Co., 36 F.R.D. 445 (N.D.Ohio 1964), indicates that exemplary damages would be permitted in an action based upon 17(a) of the Securities Act (15 U.S.C. § 77q(a)).

We are inclined to the view that the restrictive provisions of Section 28 (a) (15 U.S.C. § 78bb(a)), concerning "actual damages" were intended by the Congress to apply only to those statutory causes of action which it specifically "permitted" in the Acts—but not to other rights of action based upon the general law of tortious injury and that exemplary damages could be awarded in the pending action.

In any event, we have concluded that exemplary damages are not necessary in this case. The Court has exercised its discretion to allow substantial pre-judgment interest. Further, defendants are subject to disciplinary proceedings before the National Association of Securities Dealers pursuant to Securities Exchange Act Section 15A (15 U.S.C. § 78o-3).

This Memorandum of Decision will constitute the Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure and plaintiffs will prepare, serve and lodge with the Court a judgment based upon these findings and conclusions.