Candace VAN ALEN, Plaintiff,

v.

**DOMINICK & DOMINICK, INC. and Paul deGive, Defendants.**

No. 71 Civ. 5438.

United States District Court,
S. D. New York.

Dec. 22, 1976.

Charles Norman Shaffer, Shaffer, McKeever & Fitzpatrick, Rockville, Md., Jerome Kamerman, Kamerman & Kamerman, New York City, for plaintiff.

Jeffrey A. Barist, Vincent R. Fitzpatrick, Jr., Benjamin S. Bilus, White & Case, New York City, for defendants.

## OPINION AND ORDER

PIERCE, District Judge.

This is an action brought by plaintiff Candace Van Alen against her broker of seventeen years, Paul deGive, and deGive's employer, Dominick & Dominick, Incorporated ("Dominick"). The third amended complaint charges defendants with violations of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, violations of the rules of the New York Stock Exchange ("NYSE") and common-law fraud in the handling of plaintiff's discretionary account at Dominick during the period February 1969 through April 1970, as well as in the handling of plaintiff's discretionary custodial account controlled by deGive at The Bank of New York and later at the First National City Bank. Count One alleges churning of the accounts, for which alleged violation plaintiff seeks damages in the amount of $559,046.00, the net trading losses claimed. Count Two charges common law fraud, alleging inter alia, that the defendants falsely represented to the plaintiff that they would comply with the securities laws and the NYSE rules, and that they had developed and "perfected a system insuring profits in the purchase and sale of securities," which system would result in profits to the plaintiff. Count Three alleges excessive trading and unsuitability of securities in the Dominick account, and Count Four makes similar charges with respect to the plaintiff's custody account at The Bank of New York. Count Five was dismissed by order of this Court dated July 16, 1975. Having heard all the evidence and having considered the matter, the Court now concludes that the plaintiff's case is without merit, and dismisses the complaint in its entirety. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P.

### Findings of Fact

Candace Van Alen, prior to and during the time in question, was a woman of substantial financial position, married to a millionaire and a millionaire in her own right. Plaintiff graduated from Vassar College in 1933, having taken at least two courses in elementary economics. She testified that during her college days, she was aware of the turmoil in the securities industry, but that she did not follow the market. She was aware that many persons had experienced great losses in the securities market. Following her graduation from Vassar, plaintiff did graduate work in literary studies at Radcliffe and undertook further schooling at the Sorbonne. While Mrs. Van Alen cannot be described as a career woman, she did at one time hold the position of assistant editor at Vogue magazine, and she was a contributing editor to the New York Herald Tribune.

In 1948, plaintiff married James Van Alen, a wealthy individual who had been active in the stock market since 1940. James Van Alen was, and is the beneficiary of certain substantial family trust funds; however, the plaintiff knew that he had a lifetime beneficial interest and that no interest in these family trusts would pass to her. Accordingly, in 1948 James Van Alen gave the plaintiff, his second wife, the sum of $200,000 to be invested in the securities market; the funds were placed in a custody account at the Empire Trust Co. In the same year, James Van Alen introduced the plaintiff to defendant Paul deGive, a market analyst who was soon to join the firm of Dominick & Dominick.

In 1953, Mrs. Van Alen and her husband met with deGive to discuss the investment of plaintiff's funds. At that time the worth of the plaintiff's holdings had decreased to approximately $125,000.00. As far as Mrs. Van Alen was concerned, deGive in 1953 was one of the "guiding lights" of the Dominick firm; her husband had informed her that deGive was a very good broker. In the autumn of that year, the Van Alens and deGive met at the Van Alens' home in Millbrook, New York. The three decided that deGive should be given discretionary control over plaintiff's securities and that he should undertake to "nurture the account and make it grow". On this initial question of plaintiff's investment intent, the testimony of the adverse parties generally is consistent as to what was said in 1953. The parties discussed the fact that the fund was the extent of plaintiff's holdings, and that the plaintiff did not stand to benefit from her husband's trust interests after his death. It is clear that plaintiff asked deGive to treat the account as if it belonged to a member of his own family. Mrs. Van Alen testified that she also told deGive that she needed the money "for her old age"; however, deGive denied that such a statement was made. In any event, it is clear that Mrs. Van Alen was interested in growth as well as security. She asked deGive not only to "look after" the account, but indicated that she hoped he would "build it up."

Plaintiff testified that she wished deGive to take full control over the account since she didn't know "anything" about the stock market and since she and her husband traveled extensively, spending many months each year away from their residence in upstate New York, Long Island, and Newport, Rhode Island. On April 29, 1953, deGive was given trading authority over the Empire Trust custody account, and in July, 1953 an account was opened for the plaintiff at the Dominick firm, which at all relevant times was a brokerage and investment banking house and a member of the New York Stock Exchange. The two separate accounts were established at plaintiff's express direction.

Plaintiff testified that during their initial discussion in 1953, deGive stated that the accounts would be handled in accordance with the regulations of the securities laws and pursuant to the rules of the Exchange. While plaintiff did not have a specific understanding of the provisions of the applicable rules, she testified that it was her understanding that the rules were designed for the protection of investors. deGive testified that although he had no recollection of any discussion concerning rules and regulations, the fact that the account would be run in accordance with the applicable regulations was a fact that he believed was understood by the plaintiff.

Defendant deGive testified that he was aware of the financial position of the Van Alens, and that he was aware of the growth of their wealth during the years between 1953 and 1969. deGive knew that the net worth of James Van Alen approached one million dollars, and that he had substantial income from securities owned outright. deGive was aware of the Vanderbilt family trusts which inured to the benefit of James Van Alen, and he knew of the fact that the Van Alens maintained a shooting preserve at Millbrook, New York, an apartment at Fifth Avenue and 72nd Street in Manhattan, ten acres of land opposite the C.W. Post College on Long Island, and a principal residence on an estate overlooking the Atlantic Ocean in Newport, Rhode Island. deGive testified that he took these factors into account in his handling of plaintiff's securities accounts.

The key to the method by which deGive managed the Van Alen account, and the key to the plaintiff's claims herein, is deGive's "Technical System" which he had developed in an attempt to predict movement in the stock market on the basis, inter alia, of the amount of capital flowing in or out of the market. deGive, a chartist, employed an elaborate system of graphs to assist in the management of a number of discretionary accounts, as well as for the basis of a weekly market letter entitled "Technical Comments" (see Def. Ex. 116).

The exact operation of the technical system was described in great detail by deGive during his examination on plaintiff's direct case. The essence of the concept involved the calculation of a series of seven, ten, twelve, eighteen, and thirty-day "moving averages" employed to determine buying and selling pressures in the market as a whole. A sixty-day moving average was computed from information provided to deGive by another chartist, Lowry's Services, Inc. The information which made up these moving averages was drawn from the price action and volume of certain individual stocks, the Dow Jones Industrial, Utility and Railroad averages, and all NYSE listed stocks taken as a whole. To calculate each moving average, deGive would take the total number of issues which advanced (for a "buying" indicator) or declined (for a "selling" indicator) each day and divide that figure by the total number of issues traded. The resulting percentage ratio would be added to similar ratios for each of the days in the particular cycle, whether it was seven, ten, or thirty, and then that figure would be divided by the total number of days in the moving average. The result for each of the many moving averages was calculated each day, and the information plotted on a series of flat charts as well as on a huge scroll-type chart; this larger chart also contained certain information on market movements calculated on an hourly basis (see Plf. Ex. 35). The resultant series of lines would move up or down in cycles as market conditions changed. deGive called these lines "impulses", "thrusts" or "oscillators".

As the various moving averages produced cycles equal in length to the number of days for which they were calculated, deGive would compare the highs and the lows of the cycles to highs and lows in previous months or years. If there was concurrence among a certain number of indicators that the market was moving up or down as a whole, deGive testified that he would derive a "buy" or a "sell" signal. On the basis of these signals, deGive would write his market letter and would buy or sell securities for his discretionary accounts, including those of the plaintiff.

Since the technical system was an attempt to predict the movement of the market as a whole, deGive invested in stocks which together would reflect a cross-section of the market. deGive would purchase securities in each of three categories: those which had in the past performed behind the market, those which had performed with the market, and those which had moved ahead of the market.

The evidence for the years prior to and including 1970 strongly supports the conclusion, and the Court specifically finds, that the nature of deGive's system was such that in order to function as a basis for investment decisions, the system, as deGive understood it, indicated "major moves" in buying or selling when a certain number of indicators produced an appropriate signal. deGive testified that the 1969–70 transactions at issue in this lawsuit were "major moves" in the plaintiff's accounts, and Dominick's compliance officer Thomas Mitchell testified that deGive always made purchases or sales in all his accounts at the same time. Indeed, in 1966 and 1967, deGive made massive profits for plaintiff through such "major moves." (See Plf. Ex. 66, Def. Ex. 98(f)).

deGive employed the system as a basis for all his investment decisions and recommendations. The evidence in the case supports the conclusion that the "moves" made by deGive in the plaintiff's accounts corresponded with the recommendations made in his market letter, which was circulated to several hundred subscribers, and with the "moves" deGive made in trading for his wife's account.

While neither party presented any expert testimony with respect to the wisdom or the efficacy of the system described at trial, it is clear that for many years the system was highly successful. There is no dispute that from the beginning of his handling of the Van Alen account until the end of 1968, deGive acted in accordance with the signals given him by his system, and there can be no dispute that during this fifteen year

period deGive produced substantial growth in plaintiff's account and significant profits in many years. Further, having reviewed the exhibits and heard the testimony of the defendant deGive and assessed his demeanor, the Court finds that deGive had a strong good faith belief in the efficacy of his technical material. This finding is supported by the fact that the same recommendations were made to several hundred persons, and by the fact that deGive made parallel moves in his wife's account when he moved in plaintiff's account.

Further, it cannot be disputed that the securities purchased for the plaintiff were of reputable quality (see Def. Ex. 244). Every stock was listed on the New York Stock Exchange (*Id.*). Both plaintiff and deGive testified that once when Mrs. Van Alen asked about a certain "hot" stock, deGive refused to purchase it since it was not a listed security and since he was not familiar with the company.

From 1953 through 1966, plaintiff maintained the above-mentioned two accounts at Dominick and at the Empire Trust Co. In 1966, the Empire Trust merged into The Bank of New York, which held plaintiff's custodial account until October, 1969, when she transferred this custodial account to First National City Bank ("FNCB") upon The Bank of New York's refusal to loan money to plaintiff which she sought in order to purchase securities.

While the evidence on the issue of plaintiff's direct participation in the management of her securities accounts is mixed, the Court must conclude that the plaintiff has failed to substantiate her claim that she was ignorant of developments in her account. This finding of fact is based upon the Court's assessment of the plaintiff's own testimony at trial, and upon a comparison of that testimony with the other evidence in the case.

First, there is no dispute that from 1953 until 1970, monthly statements and confirmation slips of all trades executed in each of plaintiff's accounts were transmitted to plaintiff's home in Newport, Rhode Island, where they were reviewed by the plaintiff or by her personal secretary, Mary Grace Watson. The statements and slips were also transmitted to various attorneys who acted as tax consultants for the plaintiff. These transmittals were made pursuant to specific instructions placed upon plaintiff's account card at Dominick (Plf. Ex. 28).

Second, there is no dispute that during the period between 1962 and 1969, plaintiff obtained a series of loans, totalling hundreds of thousands of dollars in order to invest further in the market pursuant to deGive's system. While plaintiff testified that a $200,000 loan obtained from the First National City Bank in October 1969 was sought pursuant to deGive's urgings, Mrs. Van Alen offered no similar explanation concerning the several other loans of $100,000 or more obtained during the period 1962–1968. In this connection, the Court further notes that in 1963, the plaintiff converted her account at Dominick into a margin account, making possible even greater purchases of securities by deGive pursuant to plaintiff's grant of discretionary authority to him. During this same period, there was considerable correspondence between The Bank of New York, deGive, and Ms. Watson, plaintiff's secretary. In some instances over the years there was written correspondence between the plaintiff and deGive which indicated an interest by the plaintiff in her various financial undertakings.

For example, on June 7, 1962, the plaintiff wrote to deGive concerning the market's "perigrinations" (Def. Ex. 40). On October 10, 1968, plaintiff's secretary, Ms. Watson, wrote to The Bank of New York "at the request of Mrs. Candace Van Alen" to inquire about the current interest rate on one of the loans (Def. Ex. 60). On October 14, 1968, Mrs. Van Alen herself wrote to an officer at The Bank of New York concerning the tardy transmission of a letter of transmittal in connection with a tender offer which had attracted plaintiff's attention. (Def. Ex. 46). In November, 1968, Ms. Watson wrote to deGive concerning interest charged on a loan which was to be repaid through the sale of securities—this

letter specifically referred to "checking up" on the October confirmation slips. (Def. Ex. 100). While Mrs. Van Alen stated on cross-examination that she had no recollection of these letters and others, the Court is compelled to conclude that the plaintiff, either directly or through her employee Ms. Watson, was keeping watch over her accounts and over the related loans.

Finally, although the record is far from clear on the extent to which the plaintiff was in direct communication with deGive prior to and during the complaint period, it is apparent that there were discussions concerning market conditions, the advisability of loans to purchase more securities, the merits of some particular stock issues, and the indicators being generated by deGive's system.

It is further clear that the majority of these conversations concerning the plaintiff's account took place between James Van Alen, the plaintiff, and deGive. Although the plaintiff testified that she did little more than listen during these conversations, her seeming familiarity with certain of the technical terms used by deGive, combined with the undisputed fact that James Van Alen listed his own occupation as "investor" (see Def. Ex. 65, 66, 67), lead to the reasonable inference, from all the evidence, that during the period preceding and during the complaint transactions there were significant contacts between the parties with respect to the market and with respect to plaintiff's securities accounts. Further, in light of all the evidence, including the plaintiff's frequent use at trial of the term "we" in referring to actions or decisions made by her with respect to her accounts, the Court declines to accept plaintiff's testimony to the effect that she did not consult with her husband about what was transpiring in her accounts. Rather, the Court finds that James Van Alen was frequently consulted. Indeed, plaintiff had good reason to be interested in the progress of her accounts, as the following summary indicates:

| Year | Dominick Profit (Loss) | Empire/BNY Profit (Loss) |
|------|------------------------|--------------------------|
| 1964 | ($1,799) | $4,078 |
| 1965 | $6,110 | $7,076 |
| 1966 | $63,875 | $203,244 |
| 1967 | $203,126 | $352,994 |
| 1968 | ($89,950) | ($95,072) |

(Source: Def. Ex. 98(c) and 98(d))

There is no claim that during these years deGive failed to follow this system. Further, it is uncontroverted that the plaintiff never complained about the handling of the account until the beginning of 1970. As plaintiff testified on cross-examination, "I never objected to anything that he did, good or bad."

The evidence establishes that during these years, and during the period of the complaint, deGive handled plaintiff's account without any significant intervention or supervision by other members of the Dominick firm. It appears that the only surveillance of deGive's activities was made by Thomas Mitchell, Dominick's compliance officer, who with his staff reviewed each day all confirmation slips of all trades of the preceding day effected by Dominick representatives. This review also included a daily IBM printout which listed all trades made, broker by broker. Mitchell testified that this IBM run would identify the accounts involved by symbol, but that there was no way for his office to identify trades made by deGive for Mrs. Van Alen at the bank custody accounts or to separate those trades out from other trades made by the same bank for other persons through the Dominick firm. Further, it is clear from the evidence that the trades made by deGive were not initialed or approved in advance by any other member or allied member in the Dominick firm. Nor is it at all clear whether or not discretionary trades were identified as such at key control points in the Dominick operation. It is quite apparent that the officers of Dominick made no attempt to supervise the transactions occurring in the plaintiff's custodial accounts at the different banks. However, officers of Dominick who testified stated, and the Court finds the testimony credible, that they believed that during the time in

question the firm was operating within the guidelines set forth in the NYSE rules, specifically Rules 405, 408 and 342. This testimony, given by Avery Rockefeller, president of Dominick at the time in question, Thomas Mitchell, compliance officer, Robert Neumayer, vice president in charge of operations, and by Paul deGive himself, is relevant to the claimed misrepresentations alleged in Count Two, and specifically to the *scienter* element.

Despite these apparent deficiencies in the Dominick control procedures, the evidence including the unanimous testimony of the officers is that, over a period of years, they had faith in the operation of deGive's system and in deGive's professional reputation in the financial community. As stated by Mitchell, even had he detected major purchases and sales, or other purchases and sales by deGive in the Van Alen accounts, he would not have inquired of the broker since he believed that deGive knew his system better than he did, and since Mitchell believed that deGive always had valid reasons for his investment decisions. For reasons stated hereinbelow, the Court does not find persuasive the testimony of plaintiff's expert to the effect that a responsible compliance officer, under all of the circumstances presented, would have refused to allow deGive to continue trading in plaintiff's account after the May 1969 transactions.

With this background established concerning the nature of plaintiff's investment objectives, the technical system employed by deGive, the history of plaintiff's accounts in the years 1953 through 1968, and the procedures at the Dominick firm, the Court now turns to the transactions at issue in February 1969 through March 1970.

In early 1969, the total value of plaintiff's securities was approximately 1.6 million dollars, a substantial increase from the total value of $125,000 in 1953, even when the addition of the loan proceeds are considered. In late 1968 deGive had made significant sales in the accounts and by February 1969 his indicators yielded a "buy" signal. Between February 11 and 14, 1969,

deGive purchased several hundred thousand dollars of securities (Plf. Ex. 2) in what he described as a "major move" based upon favorable indications from his sixty-day and shorter moving averages. In his February 11, 1969 Technical Comment, deGive wrote that

"buying is beginning to increase and such a development after a period of sidewise market action normally signals a worthwhile advance" (Def. Ex. 166 No. 295)

At the same time, another prominent chartist upon whose information deGive relied in part, Lowry's Services, Inc., published a "buy" signal. (See Plf. Ex. 37) Further, on February 11 and 12, 1969, deGive made major purchases of similar securities for the account of his wife (see Plf. Ex. 63). On February 14, 1969, the Dow Jones Industrial Average stood at 951.95, having risen over thirty points in one month (see Def. Ex. 90).

In less than a week, both deGive's indicators and the Lowry indicators reversed course, revealing a "sell" signal. deGive testified at trial that he had made a "mistake" in early February, that he had failed to read one indicator or that he had misread an indicator. On February 17, 1969, deGive wrote as follows in his market letter:

"Last week the market entered a testing period whereby buying commenced to increase. However, to date there has not been sufficient follow through to signal a broad advance. Accordingly, a return to the sidelines is suggested until the market once more records a fully oversold condition." (Def. Ex. 166 No. 296)

On February 18 and 20, 1969, deGive sold out of plaintiff's account nearly every security purchased a week before. On the 17th and 18th he also made similar massive sales in his wife's account. The Dow Jones was quickly slipping downward, falling below 900 by February 25, 1969.

Plaintiff testified that she and her husband met with deGive for breakfast at the Westbury Hotel in New York on February 20, 1969 and again on March 6, 1969. With regard to the first meeting, Mrs. Van Alen stated that the recent activity in her

accounts was not discussed, and that she did not know of the sales since she had not been at Newport where the confirmation slips were sent. deGive testified that these meetings were during or after the time he had made the sales, and that he told Mrs. Van Alen he had made a "mistake" and that he wanted to sell to cut losses early. While deGive testified that the plaintiff approved, it is clear he was not asking permission and that he had already taken the action. The plaintiff stated that she recalled no such conversation, that there was no discussion about getting out of the market, and that no specific securities were discussed.

While the Court does not adopt totally deGive's version of the meetings, it does find his testimony more credible than that opposed to it. Thus, the Court finds that the parties met and discussed the accounts, and that the plaintiff made no complaint about deGive's activities.

After the sales in late February, 1969 deGive invested plaintiff's funds in United States Treasury bills, a transaction for which he received no commission and for which Dominick received but a flat fee of $10 for each bill purchased. Thus, plaintiff's accounts for the most part stayed out of the market until deGive's next move, in late April, 1969.

Throughout March and April 1969, the Dow Jones Industrial Average remained at the position reached shortly after the February sales, ranging between 899 and 930 or slightly higher. However, during the month of April the Dow began to move above 930, and during May the indicator climbed as high as 968. (Def. Ex. 90). On April 30, 1969, deGive wrote that "various intermediate and long term indicators are now reversing a downtrend which has been in effect since last fall." (Def. Ex. 116 No. 305) The market letter also listed a series of recommended stocks, several of which deGive bought for the plaintiff the same day. At trial, deGive testified that this was another "major move", involving at least 50% of plaintiff's holdings. deGive testified that he made these buys on the basis of his long-term indicators. deGive also made significant purchases for his wife's accounts in the same time period. On May 5, 1969, deGive's market letter again recommended certain purchases (Def. Ex. 116 No. 306) and deGive made a few more purchases for plaintiff's account.

By late May the Dow had again reversed course, slipping into the 930's and on May 26, 1969, deGive derived a "sell" signal from his long-term technical material. Further, the buy signals had, in his word, "aborted." deGive wrote as follows:

"The advance which began around the middle of April has failed to produce the normal buying surges and market breadth is negative. The various technical indicators are signalling caution. Investors should now adopt a policy of eliminating weak holdings." (Def. Ex. 116 No. 309)

On May 27, 1969, deGive sold nearly every stock held in plaintiff's accounts. Although his market letter recommended only the elimination of "weak holdings", the "major" sale proved the prudent course. In less than two weeks the Dow Industrials slumped below 900, and less than six weeks thereafter, the Dow slid downhill to close at 801 on July 29, 1969. The market never rose above the 830's until the following October. The "sell" signal derived by deGive in late May 1969 preceded a similar sell signal from Lowry's Services published on June 12, 1969. Further, deGive also made in late May substantial sales in his wife's account. Plaintiff testified that perhaps she did speak to deGive in June or July of 1969, by telephone from her Newport home. There is no evidence that Mrs. Van Alen made any complaint about the April/May transactions. Through the summer and into the early fall, as the stock market continued its hundred-point decline, plaintiff's accounts were again safely invested in Treasury bills, pursuant to deGive's directions. deGive did not return to the market until October, 1969.

It is defendants' contention that the parties met in New York on October 7, 1969 to discuss reentering the market; however,

398

the evidence is insufficient to establish whether such a meeting took place. Nevertheless, Mrs. Van Alen testified that prior to October 16, 1969, deGive had told her that his indicators recommended a return to the market. There is again no evidence that Mrs. Van Alen made any complaint during this period concerning the transactions in the accounts. In the fall of 1969, deGive was recommending purchases for intermediate and long-term holders of securities. In his October 13, 1969 market letter, he wrote as follows:

"Last week the market retested the 800 level in the Dow Jones Industrial averages with a noticeable drop in liquidation and an improvement in accumulation of stocks as compared with the other testing periods in July, August and September. "Accordingly, it is my opinion the stocks can be purchased for an intermediate advance and especially the depressed stocks which have had important declines and which during the past three months have established well defined bases." (Def. Ex. 166 No. 327)

Similarly, Lowry's Services published a "buy" signal on October 13, 1969. On that day and on days following, deGive made major purchasing moves in the plaintiff's accounts. deGive also ordered major buys in his wife's accounts. deGive testified that in his view he was buying in an intermediate oversold market condition, that the long-term indicators were favorable, and that he considered the move a long-term investment.

Shortly after this return to the marketplace, plaintiff and her husband met with deGive on October 16, 1969. At the Dominick offices, deGive displayed his system to the plaintiff. According to the plaintiff he stated that he now had the system "almost all set up". The Court finds that deGive did *not* state that the system had been perfected. There is no evidence that the plaintiff complained about the past losses in the account or that she questioned the wisdom of following the system in the future. Indeed, deGive had already returned to the market and the parties went on to consider

a $200,000 loan for the purpose of purchasing more stocks. From the evidence as a whole, the Court concludes that this $200,000 loan was made on deGive's recommendation. However, it is clear that the plaintiff concurred in the undertaking and that she took various steps to obtain the loan. Indeed, when The Bank of New York refused to give such a loan to plaintiff, she countered by closing out her entire account with that bank. deGive thereafter put the plaintiff in contact with officers of the First National City Bank (FNCB), and on October 23, 1969, that bank loaned plaintiff the amount she sought for the purpose of purchasing securities. The following day plaintiff's custodian account at The Bank of New York was transferred to FNCB. The proceeds of the loan were available to the plaintiff by October 27, 1969, and the Dow that day closed at 860.28 (Def. Ex. 90). On the same day, deGive wrote as follows in his market letter:

"Last week the market continued to advance with broad participation and satisfactory upside volume.
"The present up trend is now in the third week and is expected to last for the full six week cycle." (Def. Ex. 116 No. 329)

On October 28 and 29, 1969, deGive purchased large amounts of securities for the plaintiff, consuming almost the entire proceeds of the loan. During the month of October, deGive also made significant purchases in his wife's account.

deGive's October, 1969 market analyses were confirmed by the progress of the Dow averages. In the week preceding the October 14 purchases, the market rose from the 800 level and climbed to 830. The indicator continued to advance into late October, closing at 855 on October 28, 1969. By November 10, 1969, the Dow stood at 863.05. However, the indicator was not to climb any higher, and in fact was to plummet below 800 in less than one month (see Def. Ex. 90).

On November 10, 1969, deGive wrote that the "market is now nearing the end of a six week upcycle and will become increasingly selective. Accordingly, new buying should

be deferred for the present." (Def. Ex. 116 No. 331). On the following day deGive sold a portion of plaintiff's securities for around $90,000, earning a short-term profit for Mrs. Van Alen on each of the five issues traded. (See Plf. Ex. 2). deGive similarly made sales in his wife's account. In a letter to Mrs. Van Alen dated November 20, 1969, deGive wrote that he had made the sales to offset short-term losses already experienced in 1969 (see Def. Ex. 45).

By the end of December, the Dow Industrials, having reached a low of 773.83 on December 16, 1969, closed at the 800 level. On December 29, 1969, deGive wrote as follows:

"The current decline has completed a six week down cycle with the long term material showing a worthwhile improvement over the July bottom when the averages were at a higher level. Now is the time to assume a more aggressive buying attitude in the general market." (Def. Ex. 116 No. 338)

On that date and on January 2, 1970, deGive purchased for the plaintiff five issues in the total amount of approximately $100,000. On January 5, 1969, the market rose to 811.3, but shortly thereafter commenced another decline.

In early January, 1970, deGive spoke to the plaintiff by telephone and informed her that his technical materials were again deteriorating, and that he was recommending sales. deGive stated that he did not want to sell out the plaintiff's stocks without consulting with her and without her approval. According to deGive, Mrs. Van Alen, having listened on an extension with her husband, said, "Paul, I'll think about it and call you back." Shortly thereafter the Van Alens, vacationing in South Carolina, discussed the market at a social gathering with two prominent investment bankers, Dean Witter and Lloyd Griscom. On January 28, 1970, plaintiff and her husband telephoned deGive and ordered him to sell all of plaintiff's securities. deGive did so. The Court finds that plaintiff has not proven by a fair preponderance of the credible evidence her contention that she told deGive to "get out and stay out."

In early March, 1970, deGive spoke to plaintiff prior to making new purchases. deGive told plaintiff that certain stocks were quite depressed and that he did not believe there would be much risk of loss. After plaintiff indicated caution, deGive suggested investing 50% of her funds. deGive understood plaintiff to have approved such a move. deGive's March 2, 1970 market letter stated as follows:

"For the past four weeks the internal structure of the market has shown improvement, that is, an increasing number of stocks have been forming bases and emerging on the upside." (Def. Ex. 116 No. 347)

On March 3, and 4, 1970, deGive made another major purchasing move in plaintiff's account. The Dow average, having sunk as low as 744.06 on January 30, 1970, had risen to 787.42, and was to remain above 760 through the rest of the month (Def. Ex. 91). In late February and early March, 1970, deGive also made major purchases in his wife's account.

Shortly after the purchases, Mrs. Van Alen returned to her Newport home to find a new stack of purchase confirmations. She called deGive, asked him why he went back into the market, and requested a list of the stocks bought. Plaintiff testified that no such list was ever received. Shortly thereafter plaintiff met with her husband and deGive at their New York apartment. On April 3, 1970, plaintiff wrote to the Dominick firm, directing that all her securities be transferred to The Bank of New York and revoking the trading authorization she had given deGive in 1953. The value of plaintiff's securities at the end of March, 1970 totalled $1,004,790.81. (Pf. Ex. 20). During the period of the complaint, the Dow Jones Industrial average had declined nearly 150 points. (Def. Ex. 90, 91).

During the period of the complaint, Mrs. Van Alen paid slightly more than $73,000 in commissions on the various transactions in her accounts (Def. Ex. 242). deGive testified that one-third of all commissions were paid to him.

In 1968, deGive made approximately $14,000 in commissions from activity in plaintiff's accounts. In 1969, deGive earned $18,000 from such activity. In the period January through March, 1970, deGive earned approximately $6,000 in commissions, of which more than $4,000 resulted from the January sales ordered by the plaintiff (see Def. Ex. 242, 243). deGive testified that in 1969, his own financial condition had improved markedly. His wife had received a substantial inheritance in the years 1965–1969, and in 1969, his educational expense dropped $10,000 due to the graduation from college and graduate school of three of his children. deGive's total annual income, from commissions and from the market letter, was approximately $100,000 during each of the years 1968 and 1969.

deGive testified that he regarded the plaintiff as an "investor" as distinguished from a "trader" or a "long-term investor". Accordingly, deGive saw Mrs. Van Alen as a stockholder who held securities as long as conditions were favorable, based upon the movements of his system's sixty-day cycles. deGive did not regard the plaintiff as a person whose securities should be traded on the basis of short-term indicators, nor did he see her accounts as ones which should hold onto securities for a long period of time regardless of market conditions. However, deGive indicated that, depending on the cycles, he sometimes regarded plaintiff as an "intermediate trader" who would move on the thirty-day cycle.

Mrs. Van Alen testified that she knew that the market can go up and down. She stated that deGive never guaranteed that she'd earn profits. She never instructed deGive not to engage in short-term trading. She stated that she was aware of the risks involved in taking out loans to purchase securities. She never complained about the short-term trading in 1968 which resulted in substantial profits; indeed, she testified that deGive handled the accounts very well in 1968. At trial, plaintiff admitted that she never informed deGive whether she was interested in trading or in investment. Indeed, in her deposition, Mrs. Van Alen testified that she had no objection to short-term trading if it turned out well. Plaintiff urges that the turnover rate in her account was three for the period in question. Defendants argue that the annualized rate is only 2.17.

Upon this set of facts plaintiff seeks to hold defendants liable for alleged violations of the federal securities laws.

### Conclusions of Law

█ The federal securities laws are not a panacea for all losses suffered in the stock market upon the recommendation of brokers. A recommendation that goes awry does not make out a claim under Rule 10b–5. See *Mallinckrodt Chemical Works v. Goldman, Sachs & Co.*, 420 F.Supp. 231 [Current] (S.D.N.Y.1976) (Tenney, J.). While it is well established that a defrauded customer may sue her broker for "churning" her account and that such activity constitutes a scheme or device to defraud under Rule 10b–5, see e. g., *Carras v. Burns*, 516 F.2d 251, 258 (4th Cir. 1975), in order to prevail upon such a claim, plaintiff must show that the defendants excessively traded her account in disregard of her investment objectives and in order to obtain commissions for themselves. See *Greenfeld v. D. H. Blair & Co.* [1975–76] CCH Fed.Sec.L. Rep. ¶ 95,239 (S.D.N.Y.1975). Further, plaintiff must show that the defendants acted with *scienter*, that is, that they traded her account with an intent to defraud, see *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 592 (1976), or at least with a wilful and reckless disregard of whether or not their actions operated as a fraud upon plaintiff. See *Lanza v. Drezel & Co.*, 479 F.2d 1277, 1306 (2d Cir. 1973) (*en banc*).

> "Churning essentially involves improper purpose on the part of a broker to derive profits for himself with little regard for the interests of his customer." (*Stevens v. Abbott, Proctor & Paine*, 288 F.Supp. 836, 845 (E.D.Va.1968)).

█ While churning, if present, constitutes an insidious business practice well de-

serving of sanction under the securities laws, plaintiff cannot prevail solely upon a showing of excessive trading. See *Gleit v. Shearson, Hammill & Co.*, 74 Civ. 4082 (S.D. N.Y. October 20, 1976); *Greenfeld v. D. H. Blair, supra; Newburger, Loeb & Co. v. Gross*, 365 F.Supp. 1364, 1371 (S.D.N.Y. 1973). Plaintiff must prove that the amount of trading was unjustified under the facts and circumstances of the case and in light of her investment objectives. See *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 435 (N.D.Cal.1968), *modified on other grounds*, 430 F.2d 1202 (9th Cir. 1970).

Initially, the turnover rate in plaintiff's accounts is not excessive under the cases, even assuming that the rate is 3, as urged by the plaintiff. See *Gleit v. Shearson, Hammill & Co., supra; Moscarelli v. Stamm*, 288 F.Supp. 453 (E.D.N.Y.1968) (annual rate of 144); *Hecht v. Harris, Upham & Co., supra; Pierce v. Richard Ellis & Co.*, 62 Misc.2d 771, 310 N.Y.S.2d 266 (Civ. Ct.N.Y.Cnty.1970); see also Note, Churning By Securities Dealers, 80 Harv.L.Rev. 869 (1967):

"[I]t is possible to generalize from the SEC cases that a complete turnover more than once every two months [i. e., an annual rate of 6] is likely to be labeled excessive, and this conclusion appears reasonable." (*Id.* at 876).

While a claim of churning cannot be decided upon the turnover rate alone, plaintiff has cited no decision which has found excessive an annual rate as low as that presented here.

Second, the Court finds that the transactions executed by deGive were not excessive in light of the plaintiff's intent to "build up" her account. Nor can defendants be held liable for doing in 1969–70 that which they did from 1966 through 1968 with plaintiff's blessings. Plaintiff was in frequent contact with deGive; she was aware of his system and the fact that deGive made "major moves" and on occasion executed short-term transactions. For seventeen years confirmation slips were sent to her home and to her lawyers. It is clear from all the evidence that plaintiff was willing to accept the benefits of intermediate trading, and of deGive's system generally. She must also accept its deficiencies. Indeed, in this Court's view, this case is an appropriate one for the application of the principle of estoppel.

In *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365 (1st Cir. 1973), the Court of Appeals affirmed the lower court's grant to defendants of judgment notwithstanding the verdict, employing terms applicable to this case:

"We base this conclusion on plaintiff's uncomplaining acceptance of what was done for him by defendants over a twenty-two month period. It was uncontroverted that Landry regularly received confirmation slips and monthly statements from Hemphill, Noyes setting forth the full details of every transaction entered, and that with one minor exception . . . he at no time registered any complaints with defendants concerning the manner in which his account was being handled. Given plaintiff's obvious experience in the stock market, we hold as a matter of law that he must have realized the inconsistency between his alleged investment intent and what was actually occurring in his account; he is therefore estopped from arguing, for the purposes of his churning claim, that he was an investor rather than a trader." (*Id.* at 373–74).

Similarly, on the basis of plaintiff's acceptance for seventeen years of deGive's methods, and on the basis of the Court's assessment of her knowledge and the knowledge of her husband concerning the stock market, the Court holds that plaintiff, as a matter of law, is estopped from claiming that she was a long-term investor rather than an investor who holds only so long as conditions remain favorable.

Third, plaintiff cannot sustain her claim that deGive's actions in 1969–1970 constituted a scheme, device or artifice to defraud. As the Court has noted above, each of deGive's moves in the plaintiff's accounts was made in accordance with his

market letter, and thus was based upon the indicators of his system. Despite a valiant attempt by plaintiff's competent trial counsel, the evidence in the case just does not substantiate the claim that deGive's indicators constituted a "paper system" which defendants employed as an "umbrella" against the charge of churning. Nor has plaintiff proved by a preponderance of the evidence her claim that in 1969–70 deGive deviated from past practices and commenced to make investment decisions without consulting his long-term indicators. Rather, the evidence is that each investment decision was made after consideration of the system's indicators, and indeed, that many of the decisions made by deGive did accurately anticipate the movement of the market as a whole. This is not the usual churning case where the broker can offer no explanation or justification for his trading. See *Stevens v. Abbott, Proctor & Paine*, 288 F.Supp. 836, 840 (E.D.Va.1968); *E. H. Rollins & Sons*, 18 S.E.C. 347 (1945). Rather, here the record contains a complete rationale for each investment move made by deGive. It is not the function of this Court to judge the ultimate wisdom of those moves; nor is it the purpose of the securities laws to guard against improvident or even negligent actions of persons such as the defendants. See *Ernst & Ernst, supra.* A review of the paucity of evidence herein as to *scienter* confirms the Court's conclusion that no scheme or device is present in this case.

Since he held a discretionary power over plaintiff's accounts, deGive owed to Mrs. Van Alen the duty of a fiduciary. See *Stevens v. Abbott, Proctor & Paine, supra; Pierce v. Richard Ellis & Co., supra.* The plaintiff has failed to prove that deGive violated this trust. As noted above, the Court has found that deGive had a strong good faith belief in the efficacy of his technical materials. Here there was no attempt to conceal from the plaintiff the actions being taken. See *Stevens v. Abbott, Proctor & Paine, supra.* The great mass of the evidence militates strongly against any inference of *scienter.* When deGive made major sales in the accounts, he invested in U.S. Treasury bills, a transaction which gained him no commissions. The securities purchased were always of high caliber, reflecting a cross-section of the stocks listed on the NYSE. The financial status of deGive improved in 1969. The Court cannot find that he suddenly switched to churning in order to reap a mere $4,000 increase in commissions for that year. Further, deGive controlled a number of accounts and the percentage derived from trades in plaintiff's accounts was not more than 15 to 20% of his total commission earnings. This percentage is much lower than that in other cases where the amount warranted the inference of *scienter.* See, e. g., *Hecht v. Harris, Upham & Co., supra*, 283 F.Supp. at 436 (59% of the broker's commissions).

 Finally, two factors present here negate any inference of a fraudulent intent. There is no dispute that deGive published his recommendations to several hundred persons. There is no dispute that his decisions in plaintiff's accounts reflected similar decisions made for his spouse. These are not the acts of a broker engaged in a fraudulent scheme. In prior cases brokers have been accused of fraudulently pledging to handle the account as if it belonged to a member of their own family. See e. g., *Carr v. Warner*, 137 F.Supp. 611, 613 (D.Mass.1955). Here deGive did make such a promise, but it was not fraudulent and he did act in accordance with that commitment. The Court concludes that plaintiff has totally failed to establish the *scienter* element of her claim.

Since plaintiff has failed to prove by a preponderance of the evidence that her account was excessively traded, that the transactions were inconsonant with her investment intent, that any scheme, device or artifice to defraud was employed by the defendants, or that defendants acted with scienter, the essential elements of the churning claim have not been established, and the Rule 10b–5 claims must be dismissed.

 Nor has the plaintiff established the elements of common-law fraud. Again,

essential elements are lacking. These elements are: (1) material misrepresentation of an existing fact; (2) scienter; (3) reliance; and (4) causation. See *Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958). Further, under the applicable law, the evidence of fraud must be "clear and convincing" and any inference of fraud "unequivocal". See *Manchel v. Kasdan*, 286 A.D. 483, 484, 144 N.Y.S.2d 694 (1st Dept. 1955), *aff'd mem.*, 1 N.Y.2d 734, 151 N.Y.S.2d 940, 134 N.E.2d 687 (1956).

In her amended complaint, plaintiff lists a number of alleged misrepresentations. Each of these allegations fails to satisfy at least one of the requirements of proof. With regard to the alleged misrepresentation concerning compliance with the federal securities laws, the discussion above makes clear that no such misrepresentation was made: defendants *did* comply with the securities laws. The second claimed misrepresentation, that defendants told plaintiff they had "developed and perfected a system insuring profits" is not supported by the preponderance of the evidence. The Court finds that no such representation was made. As to the claim that the defendants said they would diligently supervise her accounts and that they would comply with the rules of the Exchange, the Court finds that while there may have been such a representation, the defendants did not, at the time the representation was made, have any intent to do anything other than comply with the applicable rules. Thus, as to these claimed statements, plaintiff has failed to prove the *scienter* element. Plaintiff has also failed to establish reliance. There is no persuasive evidence that Mrs. Van Alen relied upon the statement that Dominick would comply with the NYSE rules; indeed, she did not even know what those rules required.

Further, the Court finds there to be no credible evidence that any of the alleged misrepresentations had any causal connection to the alleged losses. The only evidence of a causal connection was presented through the testimony of an expert witness, and the Court does not find the testimony credible given the facts of this case. While the witness' credentials were adequate for certification as an expert, the Court must conclude that the hypothetical questions placed to the expert by plaintiff's counsel failed to fully reflect the circumstances of this particular case. The expert did not sit in the Courtroom throughout the presentation of the evidence; the Court finds that his understanding of the circumstances of the case was significantly limited. Further, the witness proved so inflexible on cross-examination that his testimony turned incredible; thus, his testimony to the effect that more careful supervision would have prevented some of the later trading in the account is not given sufficient weight to establish the causation element.

Finally, for the reasons discussed in the prior section, it is clear that plaintiff has not proven common law fraud by clear and convincing evidence. It is not possible to draw an "unequivocal" inference of fraud from the facts as recited above. Accordingly, the plaintiff's claims under state law must be dismissed for failure of proof.

Plaintiff's final claims, for violation of the NYSE "due diligence" and "suitability" rules, must also be dismissed for failure of proof. While there is some authority in this District that a violation of the NYSE rules rises to the level of a cause of action under Rule 10b–5, see *Starkman v. Seroussi*, 377 F.Supp. 518, 524 (S.D.N.Y. 1974) (Weinfeld, J.), the Second Circuit has not resolved the issue. See *Gleit v. Shearson, Hammill & Co., supra.*

Assuming for the sake of argument that a violation of the "suitability" and "due diligence" rules do give rise to a private action under Rule 10b–5, plaintiff has not proved that the securities purchased or the transactions made were poorly suited to her investment purposes. Nor has plaintiff established that the technical violations of the NYSE rules were made in connection with any fraud. Since a violation of the NYSE rules may state a claim for relief in federal court only if the elements of a Rule 10b–5 fraud are established, *Hecht v. Harris, Up-*

**404**

ham & Co., supra, 283 F.Supp. at 430; see Isaacs v. Chartered New England Corp., 378 F.Supp. 370 (S.D.N.Y.1974), and cases cited infra, the discussion above makes clear that the technical rules violations can produce no liability. Since plaintiff has not proven fraud, her claim based upon the NYSE rules is as deficient as if no fraud had been pleaded in the first place. See Van Alen v. Dominick & Dominick, 71 Civ. 5438 (S.D.N.Y. June 30, 1975); Rich v. New York Stock Exchange, 379 F.Supp. 1122 (S.D.N.Y.1974). Accordingly, these claims must be dismissed. See Gleit v. Shearson, Hammill & Co., supra.

■ Since deGive is not liable to plaintiff on any of her claims, Dominick & Dominick cannot be liable to plaintiff for any failure to supervise deGive. While a brokerage house may be found liable for a failure to adequately supervise an employee, such liability has been found present only where the failure was in connection with fraud. See Isaacs v. Chartered New England Corp., 378 F.Supp. 370 (S.D.N.Y.1974); SEC v. Lum's, Inc., 365 F.Supp. 1046 (S.D.N.Y.1973). Since in this case plaintiff has failed to prove any fraud, Dominick cannot be held liable for any failure to supervise deGive. Further, even if liability could be imposed in the absence of fraud, see Blake v. Harris, Upham & Co., 75 Civ. 4428 (S.D.N.Y., verdict November 19, 1976), plaintiff has failed to establish a causal connection between the technical violations of the NYSE rules and the alleged losses sustained. Accordingly, the claims based upon violations of the NYSE rules must be dismissed.

### Conclusion

Plaintiff testified that she wished her holdings to be "built up" for her old age. As aptly noted by counsel for the defendants, Mrs. Van Alen had her wish satisfied. Paul deGive took a $125,000 account in 1953 and returned a one-million dollar account in 1970. While the increase was in part due to the proceeds of various loans taken out by Mrs. Van Alen, deGive's efforts did produce substantial profits and significant net growth. Indeed, there were losses in the bear market of 1969–1970. However, the evidence presented at trial establishes that the losses suffered by the plaintiff were the result of a skittish and unfavorable stock market, and that they were not the product of any fraud by the defendants.

Judgment should be entered for the defendants Paul deGive and Dominick & Dominick, Inc., dismissing the complaint with prejudice and with costs. Counsel for defendants are directed to submit an appropriate order of judgment.

SO ORDERED.